GOODWINE STATE BANK et al., Plaintiffs-Appellees and Cross-Appellants, v. JEFFREY MULLINS, Defendant-Appellant and Cross-Appellee.

Fourth District No. 4—92—0585

Argued March 23, 1993.—Opinion filed December 22, 1993.

Charles C. Hall (argued), of Welsch & Hall, of Danville, for appellant.

Kevin M. Colombo (argued) and Jeanette E. Bahnke, both of Saikley, Garrison & Colombo, Ltd., of Danville, for appellees.

JUSTICE KNECHT delivered the opinion of the court:

Defendant, Jeffrey Mullins, appeals from an order of the circuit court of Vermilion County ordering reformation of a deed. Plaintiff, Goodwine State Bank (the Bank), has filed a cross-appeal alleging the trial court erred in granting Jeffrey's motion for summary judgment with respect to several counts of the Bank's complaint. We reverse the order of reformation but affirm the trial court in all other respects.

## I. FACTS

In 1966, James Mullins, the owner of a 120-acre farm, died. Through his will, James granted a life estate to his son, Harold Mullins, and provided that, upon Harold's death, the farm is granted outright to Harold's then-living descendents. Harold is still alive; thus, Jeffrey Mullins, Harold's only descendent, has a contingent remainder in the farm. In 1966, Harold, his wife Marjorie, and Jeffrey (then three years old) began living on the farm.

When Jeffrey was 14 or 15 years old, Harold and Marjorie told him about the terms of James' will. They did not tell Jeffrey he had an "interest" in the farm; rather, they told him when Harold died, Jeffrey would inherit the farm. At best, Jeffrey thought he had an "interest" in James' will and would someday inherit an interest in the farm.

Harold and Marjorie took out a series of loans from the Bank to finance their farming operation. In 1981 the Bank began to require Jeffrey to sign the notes and mortgages for his parents' loans. At this time Jeffrey was 18 years old and a senior in high school. After graduating from high school, Jeffrey was not involved in the farming operation, but became a welder.

In 1981 and 1982 Jeffrey signed the notes and mortgages for his parents' loans. The notes and mortgages were not explained to Jeffrey. His parents merely requested him to sign, and told him his signature was required because of the way James' will was written. In 1983 and 1984, Jeffrey was requested by his parents to sign only the mortgages, but not the notes. Again, he signed the mortgages, although they were not explained to him.

In April 1987, Harold was not actively involved in farming the land, and was no longer living at the farm. Harold and Marjorie were in the process of obtaining a dissolution. At this time Harold and Marjorie defaulted on the loan. Jeffrey went to the Bank to determine whether he could obtain a loan to pay off his parents' debt; however, since Jeffrey was not involved in the farming operation, he was ineligible for a loan.

In June 1987 the Bank prepared an agreement to settle debt (Agreement) and quitclaim deed. Under the terms of the Agreement, Harold, Marjorie, and Jeffrey would sign a quitclaim deed regarding the farm in exchange for the Bank's forgiveness of Harold and Marjorie's debt. The Agreement additionally provided if the farm was sold for an amount in excess of the debt, interest, and costs, the Bank would give the excess to Harold, Marjorie, and Jeffrey. One copy of

the Agreement and deed was sent to either Marjorie or Gene Wright, the attorney handling her divorce. The Mullinses did not discuss the terms or implication of the Agreement; however, both Harold and Marjorie told Jeffrey it would be in the family's best interests to sign the Agreement.

Jeffrey accompanied his mother to Wright's office because she told him she needed him to sign some papers to help her get her divorce finalized. Wright advised Marjorie to sign the Agreement and deed, informing her she had no interest in the property as it was Harold's nonmarital property. Jeffrey was in the room when Wright advised Marjorie. Wright did not advise Jeffrey regarding whether he should sign the Agreement and the deed. Jeffrey signed the Agreement and deed. Separate copies of the Agreement and deed were signed by Harold. The quitclaim deed was in statutory form, and could not, as a matter of law, convey a contingent remainder.

In August 1987, the Bank sold the farm and Marjorie and Jeffrey were instructed to vacate the premises. The sales price was in excess of the debt, interests, and costs and in October 1987, checks totalling $10,384.03, made payable to Harold, Marjorie and Jeffrey jointly were sent to Harold's attorney. Due to a dispute with Harold regarding the distribution of the money, Jeffrey consulted with attorney Charles Hall in December 1987. In March 1988, Jeffrey filed a notice of contingent remainder.

The Bank filed this lawsuit. The Bank originally requested a declaratory judgment that the quitclaim deed had conveyed Jeffrey's contingent remainder in the property to the Bank. The complaint was later amended to include four additional counts requesting specific performance of the Agreement, rescission of the Agreement, reformation of the Agreement, and asserting Jeffrey should be estopped from claiming his contingent remainder in the farm. Jeffrey's motion for summary judgment was granted with respect to the counts requesting a declaratory judgment, specific performance, rescission and estoppel. A trial was held based upon the Bank's claim for reformation of the Agreement. The testimony at trial was contradictory with respect to whether Jeffrey thought he had an "interest" in the farm and intended to convey that interest to the Bank by signing the deed.

In closing argument, the Bank for the first time claimed it was not requesting reformation of the *Agreement*, even though reformation of the Agreement was the relief specifically prayed for in its complaint. Rather, the Bank alleged the Agreement did not need to be reformed, since, *by its terms*, it required Jeffrey to convey his contingent remainder to the Bank. The Bank alleged the *quitclaim deed*,

to the extent it did not convey the contingent remainder, *should be reformed* to be *in conformity with the Agreement.* The trial court found reformation of the deed was within the scope of the pleadings, and the parties intended for Jeffrey to convey his contingent remainder to the Bank. Accordingly, the court ordered the deed to be reformed to convey Jeffrey's contingent remainder to the Bank.

## II. Scope Of Pleadings

Defendant alleges the trial court erred in finding reformation of the deed was within the scope of the relief sought in the pleadings. We agree. Reformation of the *deed* is not within the scope of the Bank's specific prayer for relief, which requested reformation of the *Agreement.* Reformation of the deed should not have been granted by the court in the exercise of its general equitable powers under the Bank's general prayer for relief, since defendant was surprised by the Bank's request for reformation of the deed—based upon a new theory—when both the request for reformation of the deed and the new theory were not asserted until closing argument.

In its amended complaint, the Bank alleged that in executing the Agreement and the quitclaim deed, the parties intended for Jeffrey to convey any right, title and interest he may have had in the farmland. The Bank then requested the court to reform the Agreement to require Jeffrey to convey any right, title, or interest in the farmland to the Bank. The Bank additionally requested it be awarded "such further *** relief as the Court deems just under the circumstances." At trial, defendant presented a defense against reformation of the Agreement.

In changing its theory in closing argument, the Bank, for the first time, stated it did not wish the court to order reformation of the *Agreement.* Rather, the Bank elected to take the position the Agreement provided for the conveyance of Jeffrey's contingent reminder to the Bank, and requested the *deed* be reformed to conform to the parties' agreement that the contingent remainder would be conveyed to the Bank. Specifically the Bank stated:

> "[a]nd I would note to the Court that in our amended complaint, *although the relief there requested seems to ask that the [A]greement be reformed, it's actually not the [A]greement that needs to be reformed. The [A]greement was that each of these people convey their interest by quitclaim deed.* The only problem that happened was as to Jeffrey Mullins alone the quitclaim deed as written, because it was in the statutory form, has been ruled upon by this Court that it did not convey his remainder

interest because it was contingent. Had it been a vested remainder we wouldn't be here today because it would have been conveyed by the quitclaim deed, and it can't be argued but that his parents when they signed the quitclaim deed they've conveyed their interest. They were done. There's no question that they could convey theirs by a quitclaim deed.

So really the only problem was with regard to the quitclaim deed as to Jeff, and it certainly isn't a problem to convey his contingent remainder interest by a quitclaim deed. He could have done it. It just needed additional language in the quitclaim deed. That's where the mistake occurred as far as Jeff was concerned. It should have contained additional language to convey his remainder interest in the quitclaim deed." (Emphasis added.)

*A. Scope of Prayer for Specific Relief*

■ Reformation of the *deed* was not within the scope of the specific prayer for relief. The Bank's specific prayer for relief requested reformation of the *Agreement.* Reformation of the deed is a different remedy than reformation of the Agreement because it requires different proof. In an action for reformation of the Agreement, the issue would be focused on whether there was a prior agreement or mutual understanding and intention of the parties which provided for the conveyance of Jeffrey's contingent remainder to the Bank. In an action for reformation of the deed, under the theory asserted by the Bank in closing argument, the proper focus would be on whether the Agreement itself, and not another agreement or mutual understanding and intention, provided for the conveyance of Jeffrey's contingent remainder to the Bank.

In order to be entitled to reformation of the Agreement, the Bank would have been required to prove there was some agreement between the parties other than the Agreement, or that the parties had a mutual understanding and intent which was not reflected in the Agreement. (See generally *Friedman v. Development Management Group, Inc.* (1980), 82 Ill. App. 3d 949, 952, 403 N.E.2d 610, 612; *Schmitt v. Heinz* (1955), 5 Ill. 2d 372, 379, 125 N.E.2d 457, 460.) If this were proved, the Agreement would then be reformed to conform to the prior agreement or understanding and intention of the parties.

In order to be entitled to reformation of the *deed* under the theory asserted by the Bank in closing argument, the Bank would have been required to prove the Agreement provided Jeffrey was to convey his contingent remainder to the Bank by signing a quitclaim deed, and

through a mistake, the deed did not convey the contingent remainder. If this were proved, the deed would then be reformed to conform to the agreement of the parties as reflected in the Agreement.

Thus, reformation of the Agreement and reformation of the deed are two quite different theories. One requires proof of a *prior intention* that the Agreement would require Jeffrey to convey his contingent remainder, even though by its terms the Agreement *did not* do so, while the other assumes the *Agreement* by its terms *did* require Jeffrey to convey a contingent remainder. Since these theories require different proof, and have a different focus, one cannot be said to be within the scope of the other. Moreover, as will be discussed later, evidence regarding the understanding and intentions of the parties was admissible in an action for reformation of the *Agreement*; however, it would not have been admissible in an action for reformation of the *deed* to conform to the Agreement.

## B. *General Prayer for Relief*

■■ Granting reformation of the deed, under the Bank's general prayer for relief, was improper because the Bank's ultimate-hour request for reformation of the deed and assertion that the Agreement required Jeffrey to convey his contingent remainder caught the defense by surprise. It is true a prayer for general relief is an appeal to the court to evaluate the allegations and proof and grant such relief as the equities of the case require. (*Cesena v. Du Page County* (1991), 145 Ill. 2d 32, 38, 582 N.E.2d 177, 180.) However, relief may be granted under a general prayer for relief only when it is consistent with the facts alleged and proved, provided it does not take the defendant by surprise. (*Galapeaux v. Orviller* (1954), 4 Ill. 2d 442, 450, 123 N.E.2d 321, 325.) In *Galapeaux*, the court found the granting of relief would be inappropriate, under a general prayer for relief, where the complaint was devoid of allegations supporting the relief sought by plaintiff. *Galapeaux*, 4 Ill. 2d at 450, 123 N.E.2d at 326.

Similarly, in *Yeates v. Daily* (1958), 13 Ill. 2d 510, 150 N.E.2d 159, discussing a complaint seeking equitable relief, the supreme court stated the purpose of pleadings is to advise the court and adverse parties of the issues involved and what is relied on as a cause of action, so the court may rule upon the law and the adverse parties may be prepared to meet the issue. *Yeates*, 13 Ill. 2d at 514, 150 N.E.2d at 161.

In the present case, the complaint is devoid of allegations the Agreement required Jeffrey to convey his contingent remainder to the Bank and the deed ought to be reformed. Rather, in the complaint

the Bank set forth the theory that the Agreement *did not*, but was intended to, require Jeffrey to convey his contingent remainder to the Bank. The Bank did not assert its new theory—that the Agreement *did* require Jeffrey to convey his contingent remainder and that the deed should be reformed—until closing argument. Since Jeffrey did not know of the Bank's new allegations until after the close of his case, he never had an opportunity to present evidence or defend against its assertion the Agreement, by its terms, required him to convey his contingent remainder.

Jeffrey's surprise at the change in theories is evident from the closing arguments of the parties. In closing argument, the Bank requested reformation of the *deed*, and asserted its new theory. Jeffrey, in closing argument, argued against reformation of the *Agreement*. In rebuttal, the Bank responded:

"I don't know if it's a misunderstanding on Mr. Hall's part or I don't think it's an affirmative misstatement, but I started out by saying that we're not saying the [A]greement—we're asking the Court to reform our [A]greement. We're not. His entire argument is, well, here's the [A]greement between the parties, and they're saying you're supposed to reform some other agreement; make another agreement, but that's not it at all. We're saying there was the [Agreement]. *The [Agreement] required Jeff to convey his interest by quitclaim deed*, to sign the quitclaim deed. The only problem in carrying through with that was that the quitclaim deed was missing a few words. That's what we're asking the Court to do, not make a new agreement between the parties, *because the [A]greement was clear that all of the Mullinses were going to convey their interest in the property*. They were going to sign the quitclaim deed which conveys all your interest. It just happened to be a problem that the particular form that he signed didn't convey a remainder interest. He didn't know that. He thought he had literally—and as stated here in court, he thought he had conveyed his interest. From that day forward he acted as if the property was gone, and up to then he said he thought he had his interest. But once he signed that he thought it was gone. He thought he had done what he intended to do and what he agreed to do, which is to sign a deed conveying his interest.

So, as I say, it's a misstatement to say we're asking the Court to make a new agreement between the parties. That's not what we're asking at all. *We're asking that the Court*

> *merely enforce what the parties agreed to, which is to have all of the Mullinses convey their interest.*" (Emphasis added.)

Although the Bank refers to the defense argument that the Agreement should not be reformed as a "misunderstanding" or "misstatement" by the defense, it was not a misunderstanding or misstatement on the part of the defense. Rather, the defense set forth an argument on its position regarding reformation of the *Agreement*, because until closing argument there had been no mention of an action to reform the *deed*. The Bank stated the defense misunderstood or misstated its argument, when in fact the Bank's position that the Agreement provided for the conveyance of the contingent remainder, and it was seeking reformation of the deed, as opposed to reformation of the Agreement, caught the defense by surprise.

By alleging the Agreement ought to be reformed in the complaint and throughout the trial, and then in closing argument requesting the deed be reformed to conform to the Agreement, the Bank misled Jeffrey and permitted him no opportunity to prepare or present a defense to reformation of the deed. As allegations supporting reformation of the deed were not present in the complaint and the shift from requesting reformation of the Agreement to reformation of the deed to conform with the Agreement caught Jeffrey by surprise, the granting of reformation of the deed based upon the general prayer for relief was improper.

### III. Propriety Of Order Of Reformation

■ Even were we to find reformation of the deed was within the scope of the relief requested in the pleadings, we would still reverse. The Bank failed to prove it was entitled to reformation of the deed. The theory asserted by the Bank in closing argument for reformation of the deed was that the parties agreed in the Agreement that Jeffrey would convey his contingent remainder to the Bank, and to the extent the deed did not convey the contingent remainder, the deed should be reformed. Reformation of the deed, under this theory, would only have been proper if the parties' prior agreement, as reduced to writing in the Agreement, *required* Jeffrey to convey his contingent remainder to the Bank. The Bank did not prove this because the Agreement did *not* require Jeffrey to convey his contingent remainder to the Bank.

Contrary to the Bank's assertions, the Agreement did not require Jeffrey to convey his "interest," rather, it required him to sign a quitclaim deed. Moreover, the quitclaim deed presented to Jeffrey together with the Agreement could not, as a matter of law, convey his

"interest" (*i.e.*, his contingent remainder). In ordering reformation of the deed, the trial court looked not to the Agreement, but to what it found to be the intentions and understanding of the parties in signing the Agreement. This was erroneous as the intentions and understandings of the parties with respect to a prior agreement *which had been reduced to writing* are barred by the parol evidence rule.

Under the parol evidence rule, evidence regarding the parties' understandings and intentions with respect to an agreement which has been reduced to writing may be admitted only if (1) the written agreement is ambiguous and the evidence will assist in explaining or interpreting the written agreement; or (2) through a mistake the written agreement does not reflect the actual agreement of the parties. Thus, in order to introduce parol evidence regarding the Agreement, the Bank would have been required to prove (1) the Agreement was ambiguous, or (2) through a mistake the Agreement did not reflect the actual agreement of the parties. The Bank could not prove the former, because the trial court had already ruled the Agreement was *not* ambiguous. The Bank did not prove the latter because it abandoned its claim that through a mistake the Agreement did not reflect the actual agreement of the parties. Accordingly, parol evidence regarding the intentions and understandings of the parties with respect to the *Agreement* was barred by the parol evidence rule and could not properly be considered by the court in determining whether to grant reformation of the *deed*.

### A. *Reformation*

█ In order to be entitled to reformation, plaintiff must show the parties had an agreement which, due to a mistake, was not adequately reflected in the written contract between them. Both the mistake and actual agreement other than that expressed in the writing must be shown. (*Friedman*, 82 Ill. App. 3d at 952, 403 N.E.2d at 612.) In addition to mistake, the party seeking reformation must prove (1) there was an agreement between the parties; (2) the parties agreed to put their agreement in writing; and (3) a variance between the parties' agreement and the writing. (*Briarcliffe Lakeside Townhouse Owners Association v. City of Wheaton* (1988), 170 Ill. App. 3d 244, 251, 524 N.E.2d 230, 235.) Where there was no formal prior agreement of the parties, evidence of the intention of the parties when executing the written agreement or instrument may be introduced. *West Chicago State Bank v. Rogers* (1987), 162 Ill. App. 3d 838, 850, 515 N.E.2d 1261, 1269; *Phillips v. Salk, Ward & Salk, Inc.* (1974), 20 Ill. App. 3d 359, 368, 314 N.E.2d 262, 268.

Thus, in an action to reform the Agreement, since there was no prior formal agreement between the parties, the Bank could have presented evidence of a mutual understanding and intention of the parties that Jeffrey would convey his contingent remainder to the Bank. In an action for reformation of the deed, it would have been appropriate to introduce the prior agreement of the parties, which was the Agreement. However, the issue of whether, in an action to reform an instrument (the deed) where there is a prior written agreement (the Agreement), evidence of the mutual understanding and intentions of the parties with respect to the Agreement may be admitted has not yet been decided. The application of the parol evidence rule would seem to permit testimony regarding the understanding and intention of the parties in the absence of a written agreement, but bar such evidence where an unambiguous written instrument existed.

### B. *The Agreement to Settle Debt Did Not Require Jeffrey to Convey His Contingent Remainder to the Bank*

Although the Bank alleged in closing argument the Agreement required Jeffrey to convey his "interest," a contingent remainder, to the Bank, the Agreement did not in fact require Jeffrey to do so. In order to be entitled to have the deed reformed to convey Jeffrey's contingent remainder, the Bank must show the parties, in the Agreement, agreed Jeffrey would convey his contingent remainder to the Bank. The Agreement provided:

> "In lieu of foreclosure, the undersigned Debtors agree to sign Quitclaim Deeds to the above-described real estate, and in consideration therefor, the Bank agrees not to file a foreclosure action against the undersigned Debtors, and further, the Bank agrees to fully release the undersigned Debtors from all obligations incurred under said note and mortgage."

Thus, the Agreement did not require Jeffrey to convey his contingent remainder, it merely required him to sign a quitclaim deed. This was noted by the trial court when ruling on Jeffrey's motion for summary judgment with respect to another count of the complaint. Thus, the court could not, without first ruling the Agreement meant something other than what its terms provided, or reforming the Agreement to conform to some other agreement or understanding of the parties, order the deed reformed such that it conveyed Jeffrey's contingent remainder to the Bank. What the trial court apparently did was order the deed to be reformed to conform to what the Bank alleged the Agreement was *meant* to require Jeffrey to do, not to what the Agreement *actually* required Jeffrey to do.

Analysis of the propriety of this ruling involves the interesting issue of the extent of the exception to the parol evidence rule in reformation actions. As stated above, the prior agreement of the parties, which the plaintiff must prove in a reformation action, need not be a formal agreement. Rather, the plaintiff may prove the parties had a mutual understanding and intention which was not accurately reflected in the written instrument. Where mistake is alleged, plaintiff may introduce evidence of a prior agreement or mutual understanding and intention of the parties to show the written agreement does not conform to the prior agreement or mutual understanding and intention of the parties. In the present case, the Bank contended the deed did not conform to the agreement of the parties, specifically, to the Agreement. Thus, under the mistake exception to the parol evidence rule, the Agreement is admissible to show the actual agreement of the parties regarding what "interest" the deed was intended to convey. However, the court did not merely consider the permissible parol evidence (the Agreement). Rather, it considered parol evidence (evidence of the understandings and intentions of the parties) with respect to the permissible parol evidence (the Agreement).

### C. Parol Evidence

■■ ■ As a general rule, parol evidence is not admissible to show the intentions of the parties to vary the terms of a written contract, unless the contract is shown to be ambiguous. If a contract is shown to be ambiguous, parol evidence is admissible to interpret the language of the contract. (See generally *Johnson v. Flueckiger* (1980), 81 Ill. App. 3d 623, 624, 401 N.E.2d 1317, 1318-19.) The determination of whether a contract is ambiguous is a question of law to be determined by the court. (*U R S Corp. v. Ash* (1981), 101 Ill. App. 3d 229, 233, 427 N.E.2d 1295, 1299.) There is an exception to the parol evidence rule where one party alleges the parties reached an agreement, but due to a mistake, the written contract between the parties does not reflect the true agreement of the parties. Hence, in a reformation action, extrinsic evidence in the form of the agreement of the parties (in this case, the Agreement), is admissible to show that the written contract (in this case, the deed) does not express the true agreement of the parties. If the elements of reformation are proved, the written contract (in this case, the deed) will be reformed so that it is in conformity with the agreement (in this case, the Agreement) of the parties.

## D. *The Double Parol Evidence Problem*

The Bank ultimately requested reformation of the deed to conform to the Agreement, maintaining the Agreement required Jeffrey to convey his contingent remainder to the Bank. However, since the Agreement did not actually require Jeffrey to convey his contingent remainder to the Bank, the Bank is effectively arguing the deed ought to be reformed to conform, not to the Agreement, but to what the Bank alleges the parties intended the Agreement to provide. Thus, before the deed may be reformed to convey Jeffrey's contingent remainder, the Bank must first prove the parties intended for the Agreement to require Jeffrey to convey his contingent remainder to the Bank. Whether the Bank may introduce evidence on the issue of what the parties intended the Agreement to require depends on the resolution of the compound question of whether parol evidence regarding parol evidence is admissible.

The best way to understand the problems posed by the Bank's argument is to analogize it to a potential double hearsay problem, *e.g.*, an out-of-court statement within an out-of-court statement. For example, in a negligence action between A and B, if B testifies "And then C told me that A admitted to him that she (A) was at fault in the car accident," there is an out-of-court statement within an out-of-court statement (*i.e.*, A's statement to C is an out-of-court statement, contained within C's out-of-court statement to B). In order for B's testimony to be admissible, both statements must fall within an exception to the hearsay rule. A's out-of-court statement may be admissible as an admission by a party opponent. However, the mere fact that A's statement would be admissible does not mean C's statement to B would be admissible. B's testimony regarding what C told him A said is not admissible unless C's out-of-court statement also falls within an exception to the hearsay rule.

The present case may be analogized to a double hearsay problem because it poses a "double parol evidence" problem. Normally, a deed, a written instrument, would be presumed to reflect the agreement between the parties, and parol evidence would not be admitted to show the parties actually intended for the deed to convey something other than it actually conveyed. However, in closing argument, the Bank alleged the parties, in the Agreement, agreed Jeffrey would convey his contingent remainder to the Bank by signing a quitclaim deed, but through a mistake, the quitclaim deed was not drafted to be legally sufficient to convey a contingent remainder. Accordingly, under the

mistake exception to the parol evidence rule, the Bank is permitted to introduce parol evidence, the prior agreement of the parties.

In the present case, the Bank alleges the prior agreement is the Agreement, which the Bank alleges requires Jeffrey to convey his contingent remainder to the Bank. Thus, the Agreement is the permissible parol evidence which is admissible to show the true agreement of the parties not reflected in the deed. However, since the Agreement does not in actuality require Jeffrey to convey his contingent remainder to the Bank, the Bank wishes to introduce parol evidence to prove that, although the Agreement does not state Jeffrey is required to convey his contingent remainder to the Bank, the parties *intended* the Agreement to require Jeffrey to convey his contingent remainder to the Bank. Thus, the Bank wishes to introduce parol evidence regarding the parol evidence.

As stated above, in the case of double hearsay, an out-of-court statement within an out-of-court statement, the double hearsay is inadmissible unless the both out-of-court statements fall within an exception to the hearsay rule. Similarly, we find that in order for parol evidence regarding parol evidence to be introduced, both sets of parol evidence must fall within an exception to the parol evidence rule. The Agreement is parol evidence with respect to the deed; the Agreement is admissible to prove there was a mistake in the execution of the deed. However, this does not mean that parol evidence of the parties' intentions regarding the Agreement is admissible to interpret the Agreement, unless there is a showing of ambiguity, or an exception to the parol evidence rule with respect to the Agreement.

The trial court ruled the Agreement was not ambiguous when it ruled upon Jeffrey's motion for summary judgment. Specifically, the court stated:

> "There is no specific reference in the Agreement To Settle Debt to conveying either 'all interest' of Jeff Mullins or any remainder interest. The [A]greement merely requires the execution of a Quitclaim Deed. There is no ambiguity in the written document. Jeffrey has performed what he was required to do under the specific terms of the Agreement to Settle Debt."

Since the trial court ruled there was no ambiguity in the written document, evidence of the intentions of the parties could not be admitted on the basis of ambiguity.

An exception to the parol evidence rule occurs in the case of mistake. Where a plaintiff alleges the parties had an agreement, but due to a mistake, that agreement was not accurately reflected in the written contract between the parties, parol evidence of the agreement is

admissible, and, if proved, will result in the reformation of the written contract to conform to the agreement of the parties. In the present case, the Bank in its complaint alleged the parties intended that by executing the Agreement Jeffrey would convey his contingent remainder to the Bank. The Bank requested the Agreement be reformed to require Jeffrey to convey his contingent remainder. Had the Bank not abandoned this theory, parol evidence in the form of evidence of the mutual understanding and intentions of the parties not accurately reflected in their written agreement (the Agreement) would have been admissible, and if proved, the Agreement could have been reformed to conform to the mutual understanding and intentions of the parties. However, in closing argument the Bank repudiated its claim for reformation of the Agreement, electing instead to stand on its argument the Agreement need not be reformed as, by its terms, it required Jeffrey to convey his contingent remainder to the Bank. Thus, evidence of the intentions of the parties should not have been considered under the mistake exception.

### E. *The Evidence Did Not Establish There Was an Unwritten Mutual Understanding And Intention That Jeffrey Would Convey His Contingent Remainder to the Bank*

Even if the parol evidence rule did not bar testimony regarding the parties' understanding of the agreement reduced to writing in the Agreement, the Bank did not present satisfactory evidence leaving no reasonable doubt that Jeffrey understood and intended the Agreement to require him to convey his contingent remainder to the Bank.

In a reformation action, the party seeking reformation of a written instrument has a higher burden of proof than in an ordinary civil lawsuit. (*Farmer City State Bank v. Guingrich* (1985), 139 Ill. App. 3d 416, 427, 487 N.E.2d 758, 765.) Reformation of instruments affecting personal obligations will be granted when the party seeking reformation establishes the grounds for reformation by clear and convincing evidence. (*Farmer*, 139 Ill. App. 3d at 428, 487 N.E.2d at 766.) Reformation of a deed or other instrument affecting land will be granted when the party seeking reformation presents satisfactory evidence leaving no reasonable doubt as to the mutual intention of the parties. (*Farmer*, 139 Ill. App. 3d at 428, 487 N.E.2d at 766, citing *Pulley v. Luttrell* (1958), 13 Ill. 2d 355, 148 N.E.2d 731, and *Quist v. Streicher* (1960), 18 Ill. 2d 376, 164 N.E.2d 44.) Since the Agreement and deed are instruments affecting an interest in property, the trial court should have used the higher standard of satisfactory evidence leaving no reasonable doubt as to the mutual intentions of the parties.

Accordingly, we find the trial court erred in applying the clear and convincing evidence standard. We additionally find the Bank did not present satisfactory evidence leaving no reasonable doubt as to the mutual intentions of the parties.

Jeffrey was called as an adverse witness by the Bank. Much of the testimony had to do with whether Jeffrey knew he had an "interest" in the farm, and whether Jeffrey thought he was giving up that interest by signing the Agreement and deed. The testimony on these issues is unclear partially due to the Bank's attorney's insistence upon referring to Jeffrey's knowledge that the farm would be his after Harold died as Jeffrey's "interest," despite Jeffrey's numerous statements indicating he did not know his potential inheritance was an "interest" in the farm.

Jeffrey stated on numerous occasions he did not know he had an interest in the farm. Rather, Jeffrey stated he knew, pursuant to James' will, he would inherit the farm when Harold died. The defense argues this testimony establishes Jeffrey did not know, before or at the time of signing the Agreement and deed, that he had an "interest" in the property.

The Bank, on the other hand, argues that Jeffrey testified he knew, prior to signing the Agreement and deed, that he had an "interest" in the property. Taking testimony out of context, one could argue Jeffrey knew he had an "interest" in the property. Examining the testimony in context, however, suggests Jeffrey merely testified he knew he had a potential inheritance, which he did not understand to be an "interest" but that, theoretically, one could refer to as an interest.

The Bank argues and the trial court found that in signing a deed conveying all interest, Jeffrey could only have meant to convey his interest, whatever that may have been, in the farmland. At trial, the Bank implied it was preposterous for Jeffrey to believe the Bank would require him to sign a deed if he had no interest in the farmland. This argument ignores the testimony that Jeffrey was in Wright's office when Wright advised Marjorie to sign the Agreement and deed *because she had no interest in the property*. Since the Bank wanted Marjorie to sign the Agreement and deed conveying "all interest" in the farm, even though she had no interest in the farm, it would not be unreasonable for Jeffrey to think the Bank wanted him to sign an Agreement and deed conveying "all interest" in the farm even though he thought he had no interest. Moreover, there is no indication Jeffrey understood or thought about the Agreement or deed. Jeffrey testified no one ever explained mortgages and notes to him;

however, in 1981 and 1982, when his parents asked him to, he signed mortgages and notes. In 1983 and 1984, when his parents asked him to, he signed mortgages. In 1987, his parents told him it would be in the best interest of everyone concerned if he signed the Agreement and deed. No one explained the Agreement and deed to him and he testified he did not understand them. He thought he needed to sign them in order to help his mother finalize her divorce. Since the testimony indicates that Jeffrey either did not ponder the implications of the Agreement and deed at all, or he may have thought that he, like Marjorie, was being required to sign something regarding "all interest" in the farm even though there was no interest to convey, the Bank did not prove by satisfactory evidence leaving no reasonable doubt that by signing a deed regarding "all interest" Jeffrey *intended* to convey any interest he may have had, including his contingent remainder, to the Bank.

The Bank argues Jeffrey's conduct in failing to object to the sale of the farm and moving off the farm when instructed to do so by the Bank indicates a belief, on the part of Jeffrey, that he had conveyed his interest in the farm to the Bank. It is true this behavior is consistent with a belief he had conveyed his interest; however, it is also consistent with Jeffrey's testimony he thought he had no present interest in the farm, but would inherit the farm when Harold died. Since Harold was still alive, Jeffrey may have thought he did not have a right to live on the farm until after Harold died. Thus, Jeffrey's conduct is not satisfactory evidence leaving no reasonable doubt that he intended to convey his contingent remainder to the Bank.

The Bank argues, and the trial court found, that Jeffrey accepted the benefits of the Agreement, because checks totalling $10,384.03 were made payable to Harold, Marjorie and Jeffrey jointly, and these checks were not returned to the Bank. The Bank sent two checks totalling $10,384.03, made payable to Harold, Marjorie, and Jeffrey jointly, to Harold's attorney. The checks have not been cashed but are being held by the attorney who represented Harold in his divorce. The reason Jeffrey first spoke with Charles Hall, the attorney representing Jeffrey in this action, was to initiate a claim against Harold for a portion of the checks. The Bank argues this is indicative of Jeffrey's belief that he had conveyed his interest in the farm and was entitled to the proceeds. Although this is the strongest evidence Jeffrey knew he had an "interest" in the farm, which was conveyed to the Bank, we do not find it is enough, viewed in conjunction with the other evidence, to establish beyond a reasonable doubt that Jeffrey intended to convey his "interest" to the Bank. It is also possible Jeffrey merely

thought that since he had been told he would receive a portion of the proceeds, he thought he ought to receive a portion of the proceeds, without contemplating the reasons why he might be entitled to such.

## F. *Equity*

The Bank argues it would be inequitable under the circumstances *not* to grant reformation of the deed. The Bank seems to argue it could have foreclosed upon the farm and obtained a deficiency judgment, but agreed not to in exchange for the Mullinses' promise to sign a quitclaim deed, which the Bank mistakenly believed would convey Jeffrey's contingent remainder, in addition to Harold's life estate. The Bank argues it would be inequitable to allow Jeffrey to reap the benefits of the Agreement (*i.e.*, avoiding foreclosure) without being required to relinquish his contingent remainder. Although an inequitable result, in the absence of proof of the elements of a cause of action for reformation, would not be sufficient to support the granting of reformation, we note the denial of the Bank's claim for reformation does not, in this case, cause inequitable results. This is because Jeffrey was not indebted to the Bank and would not have been liable for a deficiency judgment. It is not clear whether Jeffrey's contingent remainder was effectively mortgaged to the Bank, and even if the contingent remainder were mortgaged to the Bank, it is not clear whether the Bank could have foreclosed upon a contingent remainder.

Initially, we note Jeffrey was not indebted to the Bank. Although Jeffrey, along with Harold and Marjorie, signed the mortgage, the note was signed only by Harold and Marjorie. Thus, the Bank could not have obtained a deficiency judgment against Jeffrey. Similarly, the only debt settled by the Agreement was the debt owed by Harold and Marjorie to the Bank. Thus, the transaction did not result in relieving Jeffrey of the obligation to repay a debt.

Second, Jeffrey's contingent remainder may not have been mortgaged to the Bank. At common law a contingent remainder was an inalienable interest. The reason for this was to protect remaindermen from the sale of their contingent remainder at a price below its worth. (*Kenwood Trust & Savings Bank v. Palmer* (1918), 209 Ill. App. 370, 378, *aff'd* (1918), 285 Ill. 552, 121 N.E. 186.) A contingent remainder could not be levied upon by judicial process. (*Hull v. Adams* (1948), 399 Ill. 347, 357, 77 N.E.2d 706, 712.) Gradually, exceptions to the rule have developed.

Although a warranty deed does not convey a contingent remainder, it has been held that where the holder of a contingent remainder conveys property to a grantee, representing that he holds fee simple

title to realty and warranting title, but in actuality has only a contingent remainder in the property, the grantor will be estopped from claiming the warranty deed did not convey his contingent remainder. (*Walton v. Follansbee* (1890), 131 Ill. 147, 160, 23 N.E. 332, 335.) In *Walton*, Josephine Walton joined in the conveyance of certain property. At the time of the conveyance, Josephine had only a contingent remainder in the property. However, Josephine represented, in a covenant, she was " 'well seized of the premises' " and warranted title. (*Walton*, 131 Ill. at 159, 23 N.E. at 335.) After the conveyance, the contingency necessary to vest title in Josephine occurred, and title was vested in her. The court held this was an after-acquired estate which enured, by force of her convenant, to her grantee, and she was estopped to claim title against her grantee. (*Walton*, 131 Ill. at 160, 23 N.E. at 335.) Thus, although a warranty deed does not convey a contingent remainder, one who holds a contingent remainder and who purports to convey a fee simple interest and warrants title will be estopped from claiming the contingent remainder was not conveyed by the warranty deed.

Similarly, where a mortgage contains the word "warrant(s)," the mortgage must be construed the same as if full covenants of seizin, good right to convey against encumbrances, of quiet enjoyment, and general warranty were fully written therein. (*King v. King* (1905), 215 Ill. 100, 114, 74 N.E. 89, 94.) Thus, where a mortgagor signs such a mortgage, representing he has a fee simple interest in the property, when in fact, he does not, if he subsequently acquires title to the property, that title enures to the mortgagee, and the mortgagor is estopped from denying the mortgage or maintaining an adverse claim. (*Lagger v. Mutual Union Loan & Building Association* (1893), 146 Ill. 283, 300, 33 N.E. 946, 950.) Although the issue of whether this principle applies to contingent remainder holders has not yet been decided, presumably it would apply, as in the case of a warranty deed, where the holder of a contingent remainder deceives the mortgagee by pretending to have a fee simple interest.

Interestingly, the courts in these decisions did not alter the general rule that a contingent remainder could not be conveyed; rather, they utilized an estoppel theory to prevent a contingent remainderholder from representing he had a fee simple interest and signing a deed or mortgage purporting to convey a fee simple interest, prior to the vesting of his remainder, and then, once the remainder vested, claiming fee simple title had not been conveyed. Thus, had Jeffrey represented himself as having a fee simple interest in the farm, and signed a warranty deed conveying the property to the Bank, he would

be estopped from claiming the warranty deed did not convey his contingent remainder; if the contingency necessary to vest title in Jeffrey occured, the title would enure to Goodwine. Similarly, if Jeffrey represented himself as having a fee simple interest in the farm when he signed the mortgage in favor of Goodwine containing the word "warrant(s)," he would be estopped from claiming his contingent remainder was not mortgaged; if the contingency necessary to vest title in Jeffrey occurred, title would enure to Goodwine.

Since the courts have not yet determined whether a contingent remainder can be conveyed, but have applied an estoppel theory in the case of deceived grantees, one could argue the general rule that a contingent remainder cannot be conveyed has remained unaltered. If this argument were accepted by the court, the court might determine Jeffrey could not mortgage his contingent remainder. Additionally, since Jeffrey did not represent to the Bank he had a fee simple interest in the property, and the Bank was familiar with the document granting Jeffrey his contingent remainder, it could not claim it had been deceived and request Jeffrey be estopped from asserting his interest.

Moreover, even if the court were to determine Jeffrey's contingent remainder had been mortgaged, the court could determine that the Bank could not foreclose upon a contingent remainder, but must wait until the contingent remainder actually vested in Jeffrey before foreclosing. This is because while courts have recognized that a mortgagor may mortgage after-acquired interests by signing a mortgage containing the word "warrant(s)," the courts have held that the interest, *once it has been acquired*, becomes part of the mortgaged property. However, no court has held the Bank may foreclose upon the mortgagor's *possibility* of obtaining an after-acquired interest in the future.

Thus, it is uncertain whether Jeffrey's contingent remainder was mortgaged to the Bank and whether the Bank could have foreclosed upon the contingent remainder. The Bank seems to argue it would be inequitable not to reform the deed because the Bank could have foreclosed upon Jeffrey's interest and held Harold and Marjorie liable for any deficiency. Thus, if the deed is not reformed, the Bank argues, Jeffrey escapes foreclosure and still has the benefit retaining his contingent remainder. However, in light of the fact Jeffrey's contingent remainder may not have been mortgaged, or if it was mortgaged, that the Bank may not have been able to foreclose upon it without a lengthy legal battle, or possibly until after the remainder vested, and that under no circumstances could Jeffrey have been liable for a defi-

ciency, Jeffrey may not have reaped any benefits from the Agreement.

## IV. THE CROSS-APPEAL

The Bank alleges the trial court erred in granting defendant's motion for summary judgment with respect to its original complaint and counts I, II, III, and V of its amended complaint.

### A. *Declaratory Judgment Regarding the Nature of Jeffrey's Remainder Interest*

██ In the original complaint and count I of the amended complaint, the Bank requested the court find Jeffrey had conveyed his interest in the farm by signing the quitclaim deed. The trial court granted Jeffrey's motion for summary judgment as he has a contingent remainder interest in the property, which cannot, as a matter of law, be conveyed by quitclaim deed unless words *specifically* conveying the contingent remainder are included in the quitclaim deed. Words conveying the contingent remainder were not included in the quitclaim deed drafted by the Bank. The Bank argues the trial court erred because Jeffrey's future interest in the farm is not a contingent, but a vested, remainder. The Bank's argument reflects a fundamental misunderstanding of the laws pertaining to future interests and a misunderstanding of the pertinent cases.

A vested remainder is a right to present or future enjoyment which is given to named or otherwise determinate persons ready to take possession at any time, and postponement of their estate is not for purposes personal to them. (*Danz v. Danz* (1940), 373 Ill. 482, 486, 26 N.E.2d 872, 874.) In *Danz*, the court distinguished vested from contingent remainders, quoting from Gray's Rule Against Perpetuities, section 108, which states:

> " 'Whether a remainder is vested or contingent depends upon the language employed. If the conditional element is incorporated into the description of, or into the gift to the remaindermen, then the remainder is contingent; but if, after words giving a vested interest, a clause is added divesting it, the remainder is vested. Thus, on a devise to A for life, remainder to his children, but if any child dies in the lifetime of A his share to go to those who survive, the share of each child is vested, subject to be divested by its death. But on a devise to A for life, remainder to such of his children as survive him, the remainder is contingent.' " *Danz*, 373 Ill. at 486-87, 26 N.E.2d

at 874, quoting J. Gray, The Rule Against Perpetuities §108, at 85-86 (3d ed. 1915).

In *Danz*, the testator granted an estate to his wife, which was to terminate upon her death or remarriage. The will further provided " '[u]pon the death of my wife, or in the event of her marrying again, then all of said property hereinbefore bequeathed to her shall be vested in my nephew Edward J. Danz and my niece Margaret Kathryn Williams, share and share alike.' " (*Danz*, 373 Ill. at 486, 26 N.E.2d at 874.) The will set forth contingent dispositions of the remainder interest in the property, should the niece or nephew die prior to the wife's death or remarriage. The court concluded the remainder described in the will was in named persons, the niece and nephew, who were ready to take possession at any time. The postponement of enjoyment of the estate was for reasons personal to the widow, not to the niece and nephew. Finally, the condition was not incorporated into the description of, nor into the gift to, the remaindermen, but rather was subsequently inserted as a clause divesting the estate. Thus the remainder was not contingent upon the niece and nephew surviving the wife but was a vested remainder, subject to divestment, if they did not survive her. *Danz*, 373 Ill. at 487, 26 N.E.2d at 874.

The will in the present case is unlike that in *Danz* as it does not provide a remainder interest in named or determinable persons, and the condition is included in the gift to the remaindermen. The provision in James Mullins' will is similar to the example given in *Danz* of one granting a contingent remainder. The will, in the present case, provides:

"I give and devise all of my real estate to my son, Harold Wayne Mullins, for and during his natural life only. Upon the death of my son, Harold Wayne Mullins, I give and devise my real estate to the then[-]living descendants of my son, Harold Wayne Mullins, per stirpes and not per capita."

The remaindermen are not named in the will; rather, the remainder is to be divided among the "then[-]living descendants" of Harold. Since it cannot be determined, until Harold's death, who his "then[-]living descendants" will be, the remaindermen are not determinable. Moreover, the condition, "then living" is incorporated in the description of the remaindermen, it is not a subsequent insertion divesting the estate. Thus, the will in the present case is similar to the example of a contingent interest set forth in *Danz*, which states, " 'on a devise to A for life, remainder to such of his children as survive him, the remainder is contingent.' " *Danz*, 373 Ill. at 487, 26 N.E.2d at 874,

quoting J. Gray, The Rule Against Perpetuities §108, at 86 (3d ed. 1915).

The Bank argues the language "then living" in the will does not refer to the descendants of Harold who survive Harold, but those descendants who survive the testator. Thus, the Bank argues, since Jeffrey was the only descent of Harold surviving the testator, the remainder interest vested in Jeffrey at the time of the testator's death. In support of its position, plaintiff cites the Illinois public policy in favor of the vesting of a remainder at the earliest possible time. The supreme court, although acknowledging the public policy referred to by plaintiff, rejected a virtually identical argument in *Johnston v. Herrin* (1943), 383 Ill. 598, 50 N.E.2d 720.

In *Johnston*, the testator granted a life estate to his wife, and remainder interests to his descendants. His will provided:

> " 'At the death of my said wife, Fattima Herrin, it is my will that *** my remaining estate *** be equally divided among my surviving descendants in the same shares and proportions as they would be entitled to by the laws of descent of the State of Illinois in the event of my death intestate.' " (*Johnston*, 383 Ill. at 600, 50 N.E.2d at 721.)

The testator died, survived by his wife, and his four children: John Herrin, Jeff S. Herrin, Mark Herrin, and Cora Dawson. After the testator's death, but prior to the wife's death, Jeff and Mark filed bankruptcy and were adjudicated bankrupts. Jeff and Mark did not list any interest in the testator's estate as an asset. After the death of the wife, the bankruptcy actions were reopened. Whether the remainder interest was part of the bankruptcy estate turned on whether the interest was a vested or contingent interest prior to the death of the wife. The trustees in bankruptcy alleged Jeff's and Mark's interests were vested remainder interests during the lifetime of the wife. (*Johnston*, 383 Ill. at 601, 50 N.E.2d at 722.) The trustees argued that "surviving descendants" referred to the descendants surviving at the time of the testator's death, and not those surviving the life tenant. The trustees alleged the law favors the earliest possible vesting, and that since construing "surviving descendants" to mean the descendants surviving at the time of the testator's death would cause the remainders to vest upon the death of the testator, the earliest possible time, such a construction should be adopted by the court.

The supreme court noted the favoring of the earliest possible vesting will be applied unless the will shows an intent on the part of the testator forbidding its application. (*Johnston*, 383 Ill. at 603, 50 N.E.2d at 723.) The court stated:

"A gift to survivors, which is preceded by a particular estate at the expiration of which the gift is to take effect in possession, will take effect in favor of those, only, who survive the particular estate. Such a remainder is necessarily contingent since it cannot be known until the death of the life tenant who of the testator's surviving descendants will survive her to take the estate." (*Johnston*, 383 Ill. at 605, 50 N.E.2d at 724.)

Concluding that the remainder interests were conditioned upon the survival of the life tenant, and therefore contingent, the court stated:

"It is clear that the testator, by the use of the words 'surviving descendants,' had in contemplation the possible distribution of the remainder of his estate, after the termination of the life estate, to others than his children living at his death. Any other construction would render the use of the words 'surviving descendants' without meaning and useless. If it was the intention of the testator to vest the remainder of his estate subject to the life estate in his children, the use of the words 'surviving descendants' would be meaningless. Children are *eo nominee* descendants, but it by no means follows that descendants are necessarily children. When used in a will, 'descendants' means only lineal heirs,—those in the direct descending line from the person named,—unless there is a clear indication of intention to enlarge its meaning. 'Descendants' is good as a term of description in a will and includes all who proceed from the body of the person named to the remotest degree. *** The word 'surviving' is a part of the description of those who are to take. *** 'Surviving' is a word of survivorship which describes the gift and the donees and precludes the vesting of the gift until it can be determined who such donees are." *Johnston*, 383 Ill. at 605-06, 50 N.E.2d at 724.

Similarly, in the present case, the words "then living descendants" located in the sentence beginning with "[u]pon the death of my son" are words of survivorship. These words describe the remaindermen who are to receive the estate. If the testator had meant to vest the remainder of his estate, subject to Harold's life estate, in Harold's children, the use of the words "then[-]living descendants" would be meaningless. The testator's intent is even more clear in the present case than in *Johnston*, due to the testator's use of the word "then" before "living descendants." The word "then" references a time. The time referenced in the sentence is "[u]pon the death of my son, Harold." Thus, the remainder vests in the descendants of Harold who are alive at the time of Harold's death.

The Bank next argues the use of the words "per stirpes and not per capita" are words which contradict the requirement that the descendants survive Harold. *Per stirpes* and per capita are terms used to specify the method of distribution of property. A per capita distribution to a named person's descendants results in each descendant's receipt of an equal share of the property, regardless of whether the descendants are children, grandchildren, or great-grandchildren of the named person. (See generally *Mercantile Trust & Savings Bank v. Rogers* (1955), 5 Ill. App. 2d 162, 169, 124 N.E.2d 683, 687.) A distribution *per stirpes* is the antithesis of a distribution per capita. (*Peoples Bank v. Rankin* (1968), 94 Ill. App. 2d 368, 371, 236 N.E.2d 770, 772.) The words *per stirpes* denote a taking by right of representation of that which an ancestor would take if living. (*Mercantile Trust,* 5 Ill. App. 2d at 169, 124 N.E.2d at 686-87.) Thus, in the present case, if Harold were to father another son, X, and X were to father two children, Y and Z, and X died prior to Harold's death, Harold's surviving descendants would be Jeff, Y, and Z. If the distribution were made per capita, Jeffrey, Y, and Z would each receive a one-third share of the property. However, under a *per stirpes* distribution, Y and Z would only be entitled to the share X would have taken had he survived Harold. Thus, Jeffrey would be entitled to a one-half share of the property, and Y and Z would each be entitled to a one-fourth share of the property (one-half each of X's one-half share).

Since *per stirpes* and per capita are merely terms used to designate the method of determining the shares to which the remaindermen are entitled, it does not contradict the requirement that in order to qualify as a remainderman under the will in the present case, an individual must (1) be a descendant of Harold and (2) survive Harold. Moreover, an argument that words of distribution were determinative of whether a remainder interest was vested or contingent was rejected by the supreme court in *Johnston.* The will in *Johnston* provided the remainder interest was to be divided among the testator's surviving descendants in the share they would receive under the State intestacy laws. The trustees argued this provision indicated an intent of the testator that the remainder interest vest at the time of the testator's death. The supreme court disagreed, finding the provision merely indicated the quantum of the estate to go to such descendants rather than those entitled to take under the will. (*Johnston,* 383 Ill. at 606, 50 N.E.2d at 724.) Similarly, in the present case, the specification that distribution shall be made *per stirpes* rather than per capita is an instruction of the quantum of the estate which is to be given to each of Harold's surviving descendants. This is not inconsistent with the

requirement that only the descendants of Harold who survive him may take under the will; rather, it is an instruction of how the estate shall be distributed to those descendants who do survive Harold.

Finally, the Bank argues this court's decision in *Jurgens v. Eads* (1978), 67 Ill. App. 3d 52, 383 N.E.2d 1003, requires a finding that Jeffrey's interest vested upon the death of the testator. Specifically, the Bank cites the following language:

> "A *contingent* remainder is either to a person not yet ascertained or not in being or depends upon an event which may never happen, while a *vested* remainder is to one ready to come into possession upon the termination of the prior estate. The distinction between vested and contingent is not the uncertainty whether the vested remainderman will live to enjoy his interests, but whether he will ever have a right to enjoyment. Thus, a gift is vested even if the right of enjoyment is deferred and neither a prior estate for life nor a condition subsequent will make it contingent." (Emphasis in original.) (*Eads*, 67 Ill. App. 3d at 57, 383 N.E.2d at 1006.)

In *Eads* the testator granted a life estate to his wife, and provided the remainder was to be distributed, after the wife's death, to six named individuals. The will further provided for contingent distributions in the event of the death of a named remainderman prior to the death of the wife. The will in *Eads* was similar to that in *Danz*. In both *Danz* and *Eads*, the interests of the named remaindermen were vested since the remaindermen were named, the postponement of the enjoyment of the estate was for reasons personal to the wife, rather than to the remaindermen, and the condition was not incorporated into the description of, nor into the gift to, the remaindermen, but was instead subsequently inserted as a clause divesting the estate if the remaindermen did not survive the life tenant. There is no discussion of the interests of "then[-]living descendants" in *Eads* simply because the testator in *Eads* did not grant a remainder to his "descendants," but to named individuals. Similarly, there is no discussion of a survivorship condition in the description of the remaindermen, simply because the testator in *Eads* did not include such a condition. However, in the present case, the testator did not name the remaindermen, and included a survivorship condition. Since the descendants surviving Harold are not determinable until Harold's death, and the survivorship condition was not a condition subsequent, but a condition on the ability of the descendants to take, the present case is unlike *Eads* and *Danz*, and Jeffrey's interest is not a vested, but a contingent, remainder.

A vested remainder may be conveyed by quitclaim deed. (See *Brown v. Hall* (1944), 385 Ill. 260, 272, 52 N.E.2d 781, 786.) However, a contingent remainder is not an estate, but merely the possibility of having an estate in the future, and it cannot be levied upon by legal process or voluntarily conveyed by deed, though a warranty deed may transfer the title by estoppel after the happening of the contingency. (*Kohl v. Montgomery* (1940), 373 Ill. 200, 209, 25 N.E.2d 826, 830.) A quitclaim deed, executed in statutory form, will not convey a contingent remainder. (*DuBois v. Judy* (1920), 291 Ill. 340, 347-48, 126 N.E. 104, 107; see also *Brown*, 385 Ill. at 272, 52 N.E.2d at 786.) A quitclaim deed may only convey contingent interests if appropriate words are employed in the deed to express such an intention. (*Citizens National Bank v. Glassbrenner* (1941), 377 Ill. 270, 278, 36 N.E.2d 364, 369.) Since Jeffrey's future interest in the farm is a contingent remainder, the trial court correctly determined that, as a matter of law, Jeffrey could not convey his future interest in the farm by signing a quitclaim deed. Accordingly, the trial court correctly granted summary judgment regarding plaintiff's original complaint, and count I of its amended complaint.

## B. *Specific Performance of the Agreement*

██ In count II of the amended complaint, the Bank requested the court to order Jeffrey to specifically perform the Agreement. The trial court granted Jeffrey's motion for summary judgment on this issue as he had already performed what he was required to do under the Agreement. The Agreement prepared by the Bank required Jeffrey to sign a quitclaim deed. The Bank provided Jeffrey with a quitclaim deed, which he signed. The Bank cannot sue to have Jeffrey ordered to specifically perform that which he has already performed; nor may the Bank request Jeffrey to specifically perform a contract which the Bank wishes it had made with Jeffrey, but did not.

Specific performance is an equitable remedy requiring a defendant to perform an affirmative act in order to fulfill a contract. (*Dixon v. City of Monticello* (1991), 223 Ill. App. 3d 549, 560, 585 N.E.2d 609, 618.) In order to be entitled to specific performance, plaintiff must allege and prove the following elements: (1) the existence of a valid, binding, and enforceable contract; (2) plaintiff has complied with the terms of his contract or is ready, willing, and able to perform his part of the contract; and (3) defendant failed or refused to perform his part of the contract. (*Dixon*, 223 Ill. App. 3d at 561, 585 N.E.2d at 618.) Plaintiff is not entitled to specific performance because it cannot prove Jeffrey failed or refused to perform his part of the contract.

The Agreement provided: "[i]n lieu of foreclosure, [Harold, Marjorie, and Jeffrey] agree to sign Quitclaim Deeds to the [farm]." It is undisputed the Bank provided Jeffrey with a quitclaim deed and the same was signed by Jeffrey. Thus, Jeffrey has performed his part of the contract. It, therefore, necessarily follows the Bank cannot prove he failed or refused to perform.

The Bank alleges Jeffrey has only partially performed under the Agreement because he has failed to acknowledge conveyance of "all interest" to the Bank. This argument must fail as the Agreement did not require Jeffrey to convey "all interest," or his contingent remainder to the Bank. It required him to sign the quitclaim deed provided to him by the Bank. The Illinois legislature has provided a quitclaim deed may be, in substance, in the following form:

> "The grantor (here insert grantor's name or names and place of residence), for the consideration of (here insert consideration), convey and quit claim to (here insert grantee's name or names) *all interest* in the following described real estate (here insert description), situated in the County of _____, in the State of Illinois." (Emphasis added.) (Ill. Rev. Stat. 1991, ch. 30, par. 9.)

The statute additionally provides:

> "Every deed in substance in the form described in this Section, when otherwise duly executed, shall be deemed and held a good and sufficient conveyance, release and quit claim to the grantee, his heirs and assigns, in fee of all the *then existing* legal or equitable rights of the grantor, *** but *shall not extend to after[-]acquired title* unless words are added expressing such intention." (Emphasis added.) Ill. Rev. Stat. 1991, ch. 30, par. 9.

The quitclaim deed signed by Jeffrey was in the statutory form and did not provide for the conveyance of after-acquired title. Thus, by signing the quitclaim deed, conveying "all interest," Jeffrey conveyed all his then-existing legal or equitable rights to the Bank. Contingent remainders are not " 'existing legal or equitable rights,' " and contingent interests are not transferred by a quitclaim deed unless appropriate words are employed in the deed to express an intention to convey the contingent interests. (*Citizens National*, 377 Ill. at 278, 36 N.E.2d at 369.) Thus, the quitclaim deed signed by Jeffrey did not, as a matter of law, convey his contingent remainder in the farm.

Jeffrey completely performed his part of the contract by signing the quitclaim deed provided to him by the Bank. Since the quitclaim deed did not convey his contingent remainder, the filing of a notice of

contingent remainder was not inconsistent with performance of the contract.

The Bank argues there is an ambiguity in the Agreement, because it did not specify the extent of the interest to be conveyed by the quitclaim deed. We affirm the trial court's finding the Agreement was not ambiguous. The Agreement required Jeffrey to sign a quitclaim deed. The Bank drafted a quitclaim deed. The Bank, confined only by the terms of the Agreement and applicable statutes, could have prepared any sort of a quitclaim deed it chose. For whatever reason, the Bank prepared a quitclaim deed which could not, as a matter of law, convey Jeffrey's contingent remainder.

Clearly the Bank wishes it would have drafted a quitclaim deed which would have been legally sufficient to convey Jeffrey's contingent remainder. In the alternative, the Bank wishes it would have drafted an agreement requiring Jeffrey to sign a quitclaim deed containing language sufficient to convey his contingent remainder to the Bank. However, the Bank did not. It drafted an agreement requiring Jeffrey to sign a quitclaim deed, and then drafted a quitclaim deed which did not convey Jeffrey's contingent remainder. A court has no authority to compel a party to do something different from that which, by his contract, he has agreed to do. In specific performance it is the province of the court to enforce the contract which the parties have made and not to make a contract for them and then enforce it. (*White v. Lang* (1948), 401 Ill. 219, 223, 81 N.E.2d 897, 899.) Thus, the court could not order Jeffrey to specifically perform a contract the Bank wished it had made, but had not in fact made.

Since Jeffrey performed the unambiguous contract, the Bank could not prove Jeffrey failed or refused to perform his part of the contract. Accordingly, the trial court properly granted Jeffrey's motion for summary judgment with respect to the count of the complaint requesting specific performance.

### C. *Rescission of the Agreement*

■■ In count III of its amended complaint, the Bank prayed for rescission on the basis of failure of consideration. The trial court granted Jeffrey's motion for summary judgment on this count as the mutual promises of the parties provided consideration for the Agreement. The trial court further noted that although the Bank may have thought it was receiving more than it actually received, the Bank's misunderstanding of the law does not cause there to be a failure of consideration.

A contract must be supported by consideration. Consideration is an act or promise which is of benefit to one party or detriment to another. Detriment means giving up something which immediately prior thereto the promisee was privileged to retain, or doing or refraining from doing something which he had been privileged to do or not to refrain from doing. Benefit means the receiving as the exchange for the promise of some performance or forbearance which the promisor was not previously entitled to receive. That the promisor desired it for his own advantage and had no previous right to it is enough to show that it is beneficial. *Hamilton Bancshares, Inc. v. Leroy* (1985), 131 Ill. App. 3d 907, 913, 476 N.E.2d 788, 792.

While the court will inquire to determine whether a contract is supported by consideration, it will not inquire into the adequacy of the consideration. (See generally *Sta-Ru Corp. v. Mahin* (1976), 64 Ill. 2d 330, 338, 356 N.E.2d 67, 71.) It is not the function of the circuit court or the appellate court to review the amount of consideration which passed to decide whether either party made a bad bargain, unless the amount is so grossly inadequate as to shock the conscience of the court. *(Bonner v. Westbound Records, Inc.* (1979), 76 Ill. App. 3d 736, 743, 394 N.E.2d 1303, 1308.) The mere inadequacy of price, in absence of showing of fraud or unconscionable advantage taken, ordinarily is insufficient to justify setting aside the contract. *In re Estate of Cohan* (1978), 59 Ill. App. 3d 963, 967, 376 N.E.2d 628, 631.

In the present case the Agreement was supported by the mutual promise of the parties. We do not determine whether the mortgage signed by Jeffrey was legally adequate to mortgage his contingent remainder, nor do we determine whether the Bank could successfully foreclose upon such an interest. However, whether or not the Bank would ultimately succeed, it did have a legal right to initiate foreclosure proceedings, but promised to forbear from doing so. Harold, Marjorie, and Jeffrey had no legal obligation to sign a quitclaim deed, but promised to do so. The mutual promises were consideration which supported the contract.

The Bank argues the consideration it received was inadequate. The Bank essentially argues it had the right to foreclose upon all present and future interests held by Harold, Marjorie and Jeffrey, and intended to agree to forbear from doing so, in exchange for the receipt of all present and future interests held by Harold, Marjorie, and Jeffrey. However, under the Agreement and quitclaim deed prepared by the Bank, it received only Harold's life estate and not Jeffrey's contingent remainder. If Jeffrey's contingent remainder was actually mortgaged, and if the Bank could have successfully foreclosed upon

the contingent remainder, then the Bank probably did not make a very good bargain by providing Jeffrey with a quitclaim deed which did not convey his contingent remainder to the Bank. However, it is not the responsibility of the court to ensure parties to a contract make a good bargain. Nor is it the responsibility of the court to protect banks by excusing them from contracts they wish they would not have made, but did, due to their failure to adequately research the applicable laws.

As the mutual promises constitute consideration to support the contract, and the court will not inquire into the adequacy of the consideration, the trial court correctly found the Bank could not, as a matter of law, prove it was entitled to rescission based upon lack of consideration. Accordingly, the trial court correctly granted Jeffrey's motion for summary judgment on this issue.

## D. *Estoppel*

 In count V of the amended complaint, the Bank requested the court find Jeffrey was estopped from claiming he had a contingent remainder in the farm, because (1) he signed a quitclaim deed conveying "all interest" in the property, and (2) the Bank relied upon the quitclaim deed in warranting title to the subsequent purchasers of the property. The court granted Jeffrey's motion for summary judgment on this issue as the Bank could not prove it did not know the nature of Jeffrey's interest in the property, and it reasonably relied upon any alleged misrepresentations by Jeffrey.

Estoppel is an equitable doctrine preventing a party from taking advantage of his own wrongdoing. (*Neaterour v. Holt* (1989), 188 Ill. App. 3d 741, 749, 544 N.E.2d 846, 851.) The elements of estoppel are (1) words or conduct of the party against whom estoppel is alleged, constituting either misrepresentation or concealment of material facts; (2) knowledge on the part of the party against whom estoppel is asserted that the representations were untrue; (3) the party claiming the benefit of estoppel must not have known the representations were false either at the time they were made or at the time they were acted upon; (4) the party estopped must either intend or expect that his conduct or representations will be acted upon by the party asserting estoppel; (5) the party claiming the benefit of estoppel must have relied or acted upon the representations; and (6) the party claiming the benefit of estoppel must be in a position of prejudice if the party against whom estoppel is alleged is permitted to deny the truth of the representations made. *Vaughn v. Speaker* (1988), 126 Ill. 2d 150, 162-

63, 533 N.E.2d 885, 890; *Jones v. Meade* (1984), 126 Ill. App. 3d 897, 902-03, 467 N.E.2d 657, 661.

Jeffrey made no representations to the Bank regarding the nature of his "interest" in the property; the Bank was apprised of the terms of the will granting Jeffrey his contingent remainder in the property; the Bank could not reasonably have relied upon its mistaken assumption that a quitclaim deed in statutory form was sufficient to convey a contingent remainder, as this mistake could have been avoided by reference to applicable statutes and case law; and finally, if the Bank is prejudiced by the transaction, it is not due to misrepresentations of Jeffrey, but to its own failure to adequately research pertinent issues of law. Accordingly, the circuit court correctly granted Jeffrey's motion for summary judgment on this issue.

## V. CONCLUSION

We reverse the judgment appealed insofar as it ordered reformation, and otherwise affirm.

Affirmed in part; reversed in part.

COOK and GREEN, JJ., concur.