**WH SMITH HOTEL SERVICES, INC., Plaintiff–Appellee,**

v.

**WENDY'S INTERNATIONAL, INC., Defendant–Appellant.**

Nos. 93–1776, 93–2222.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 9, 1994.

Decided May 23, 1994.

Robert J. Rubin (argued), David H. Latham, Altheimer & Gray, Chicago, IL, for plaintiff-appellee.

Mitchell Ware, Frank M. Grenard, Cathy A. Pilkington (argued), Jones, Ware & Grenard, Chicago, IL, for defendant-appellant.

Before WOOD, Jr., EASTERBROOK, and RIPPLE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

An oasis is a "small place preserved from surrounding unpleasantness," *The American Heritage Dictionary* 856 (2d ed. 1982), but for WH Smith Hotel Services, Inc. (Smith), and Wendy's International, Inc. (Wendy's), unpleasantness permeated their operations in the Hinsdale and Lake Forest Tollway oases. On September 27, 1984, Wendy's entered into an operating agreement with the Illinois State Tollway Authority to operate tollway oases in Hinsdale and Lake Forest, Illinois (the Wendy's–Authority Agreement). That agreement obligated Wendy's to oversee fast food restaurants, gift shops, and floral shops at the oases.

Because Wendy's lacked experience in the gift and flower businesses, however, it decided to negotiate sub-operating agreements for the operation of the gift and floral shops with Smith, which had experience managing gift shops. Wendy's and Smith finalized those agreements on November 27, 1984 (the Wendy's–Smith Agreement). The nature of the Wendy's–Smith agreement is at the heart of this dispute.

### I. The Agreements

#### A. The Wendy's–Authority Agreement

Wendy's and the Tollway Authority created a draft agreement regarding operation of the tollway oases, but the draft differed in an important respect from the final version. The draft of the Wendy's–Authority agreement obligated Wendy's to pay the Authority both a fixed minimum compensation and a percentage compensation for operating the gift and floral shops at the Hinsdale Oasis. The draft set the minimum compensation at $22,400 per six month period.[1]

Percentage compensation worked according to the following formula. When, in either the first or last six months of the year, the sum of 15% of gift shop sales in excess of $200,000 plus 10% of floral shop sales in excess of $87,500 exceeds $22,400 (minimum compensation), Wendy's must pay the Authority the difference between the sum and

---

1. We regret the necessity to make the analysis so mathematically complex (as will be seen to a greater degree *infra*), but doing so best illustrates our reasoning.

$22,400.[2] If, for example, the gift shop had $300,000 in gross sales and the floral shop had $100,000 in gross sales, percentage compensation would be as follows:

PC = (15%($300,000) + 10%($100,000)) − $22,400
PC = ($45,000 + $10,000) − $22,400
PC = $55,000 − $22,400
PC = $32,600

Total compensation under the draft Wendy's–Authority Agreement using the above example would be $55,000, percentage compensation of $32,600 plus minimum compensation of $22,400.

The final Wendy's–Authority Agreement, however, differed in a crucial respect. That agreement contained the same formula *except* that it did not deduct minimum compensation from percentage compensation owed.[3] Using the same example, percentage compensation would be as follows:

PC = 15%($300,000) + 10%($100,000)
PC = $45,000 + $10,000
PC = $55,000

Under both the draft and final Wendy's–Authority Agreement, the provisions governing the Lake Forest Oasis operated in much the same manner as detailed regarding the Hinsdale Oasis.

### B. The Wendy's–Smith Agreement

The Wendy's–Smith Agreement was similar in nature to the Wendy's–Authority agreement. Wendy's required Smith to pay a fixed minimum compensation of $55,700 per year ($11,100 more than the $22,400 per six months Wendy's was obligated to pay the Authority). Wendy's also included a percentage compensation formula in the Wendy's–Smith Agreement. Paragraph 3.B of the Wendy's–Smith Agreement, which gov-

**2.** The draft agreement read as follows:
When the sum of fifteen percent (15%) of Gross Sales in excess of $200,000 from the gift shop and vending plus ten percent (10%) of Gross Sales in excess of $87,500 from the Floral Boutique exceeds $22,400 during the first or last six (6) months of a calendar year, OPERATOR agrees to pay the AUTHORITY additional compensation equal to the difference between such sum and $22,400. This additional compensation due the AUTHORITY shall be paid within thirty (30) days after the end of each six (6) month period.

**3.** The final agreement for percentage compensation in the Hinsdale Oasis read as follows:

erns the computation of percentage compensation, reads:

> Percentage Compensation shall be equal to the extent to which the Percentage (as set forth below) of Gross Sales for any Term Year exceeds [minimum compensation] payable with respect to that year. Percentage Compensation shall be calculated according to the following schedule:

| Percentage Rate | Annual Gross Sales |
|---|---|

16% of all sales over $287,500 up to $400,000
17% of all sales over $400,000 up to $600,000
18% of all sales over $600,000 up to $800,000
19% of all sales over $800,000.

Paragraph 3.B is subject to several possible interpretations. Examining what Smith paid Wendy's as percentage compensation is helpful in explaining the possible interpretations of Paragraph 3.B:

#### Hinsdale Oasis

| Year | Gross Sales | Percentage Compensation |
|---|---|---|
| 1985 | $250,149 | $ 0 |
| 1986 | $347,090 | $ 0 |
| 1987 | $365,558 | $12,489 |
| 1988 | $440,125 | $24,821 |
| 1989 | $375,288 | $14,046 |
| 1990 | $341,912 | $ 8,902 |
| 1991 | $328,852 | $ 6,616 |

#### Lake Forest Oasis

| Year | Gross Sales | Percentage Compensation |
|---|---|---|
| 1985 | $388,445 | $ 0 |
| 1986 | $505,419 | $26,221 |
| 1987 | $505,057 | $35,860 |
| 1988 | $609,111 | $53,549 |
| 1989 | $568,523 | $47,645 |
| 1990 | $529,343 | $40,887 |
| 1991 | $503,832 | $35,651 |

The operator shall pay additional compensation when gross sales from gift shop and vending exceed $200,000, and/or gross sales from the floral boutique exceed $87,500 during any first or last six month period of any calendar year. When gross sales from gift shop and vending exceed $200,000 and/or gross sales from the floral boutique exceed $87,500 during any first or last six month period of any calendar year, additional compensation equal to 15% of gross sales in excess of $200,000 from gift shop and vending, plus 10% of gross sales in excess of $87,500 from the floral boutique shall be paid to the authority.

Total percentage compensation paid by Smith for both oases in 1985–1991 was $306,687.

Paragraph 3.B of the Wendy's–Smith Agreement is susceptible to three different interpretations, which we shall label Interpretation One, Interpretation Two, and Interpretation Three.[4] Under Interpretation One, percentage compensation should be calculated strictly according to its rate schedule. If, for example, Smith had $500,000 in gross sales, Interpretation One would require Smith to pay Wendy's 16% of $400,000 ($64,000) plus 17% of $100,000 ($17,000), minus $55,700 (minimum compensation, for a total of $25,300 percentage compensation). This is the formula Smith used, for example, in formulating percentage compensation in 1986 at the Lake Forest Oasis ((16%($400,000)) + (17%($105,419)) − $55,700 = $26,221). If Smith had consistently used Interpretation One, Smith would have paid Wendy's as follows: [5]

Hinsdale Oasis

| Year | Gross Sales | Percentage Compensation |
|---|---|---|
| 1985 | $250,149 | $ 0 |
| 1986 | $347,090 | $ 0 |
| 1987 | $365,558 | $ 2,789 |
| 1988 | $440,125 | $15,121 |
| 1989 | $375,288 | $ 4,346 |
| 1990 | $341,912 | $ 0 |
| 1991 | $328,852 | $ 0 |

Lake Forest Oasis

| Year | Gross Sales | Percentage Compensation |
|---|---|---|
| 1985 | $388,445 | $ 6,451 |
| 1986 | $505,419 | $26,221 |
| 1987 | $505,057 | $26,160 |
| 1988 | $609,111 | $43,940 |
| 1989 | $568,523 | $36,949 |
| 1990 | $529,343 | $30,288 |
| 1991 | $503,832 | $25,951 |

Under Interpretation One, total percentage compensation due for 1985–1991 would be $218,216, leaving Smith with having overpaid Wendy's by $88,471 ($306,687 − $218,216 = $88,471).

The difficulty with Interpretation One is that it moots out the inclusion of the $287,500

breakpoint in the rate schedule. The first line of the rate schedule calculates 16% of gross sales over $287,500 up to $400,000, from which $55,700 is deducted. If, however, gross sales totaled (for example) $300,000, no percentage compensation would be due—16% of $300,000 is $48,000, which is less than the $55,700 minimum compensation figure. The real breakpoint at which percentage compensation becomes due is $348,125 ($55,700/.16 = $348,125), and under Interpretation One the $287,500 figure has no effect.

Under Interpretation Two of Paragraph 3.B, percentage compensation is calculated by taking the sum of 16% of all sales made after $287,500 and up to $400,000, 17% of all sales from $400,001 to $600,000, 18% of all sales from $600,001 to $800,000, and 19% of all sales from $800,001 up—all without deducting minimum compensation. This is the formula Smith used for both oases from 1987 through 1991. For example, in 1987 at the Lake Forest Oasis, the calculation for the $505,057 in gross sales would be as follows:

PC = 16%($400,000 − $287,500) + 17($505,057 − $400,001)
PC = 16%($112,500) + 17%($105,056)
PC = $18,000 + $17,860
PC = $35,860

If Smith had consistently used Interpretation Two, Smith would have paid Wendy's as follows:

Hinsdale Oasis

| Year | Gross Sales | Percentage Compensation |
|---|---|---|
| 1985 | $250,149 | $ 0 |
| 1986 | $347,090 | $ 9,534 |
| 1987 | $365,558 | $12,489 |
| 1988 | $440,125 | $24,821 |
| 1989 | $375,288 | $14,046 |
| 1990 | $341,912 | $ 8,706 |
| 1991 | $328,852 | $ 6,616 |

Lake Forest Oasis

| Year | Gross Sales | Percentage Compensation |
|---|---|---|
| 1985 | $388,445 | $16,151 |
| 1986 | $505,419 | $35,921 |
| 1987 | $505,057 | $35,860 |
| 1988 | $609,111 | $53,640 |
| 1989 | $568,523 | $46,649 |
| 1990 | $529,343 | $39,988 |
| 1991 | $503,832 | $35,651 |

---

4. These labels are our own, and when we employ them with reference to trial testimony, we do not mean to imply that a particular witness referred to the label by name, but rather the content associated with the label.

5. All computations are rounded to the nearest whole number.

Under Interpretation Two, total percentage compensation due for 1985–1991 would be $340,072, leaving Smith with having *underpaid* Wendy's by $33,385 ($306,687 − $340,072 = −$33,385).

Unfortunately, Interpretation Two also suffers from a major difficulty. The text of Paragraph 3.B explicitly states that percentage compensation shall be due only to the extent that it exceeds minimum compensation, but Interpretation Two does not deduct minimum compensation. In fact, under Interpretation Two percentage compensation is due even if gross sales are less than the natural breakpoint of $348,125 discussed in Interpretation One (for example, using Interpretation Two in 1990 for the Hinsdale Oasis required payment of $8,902 in percentage compensation for gross sales of $341,912; if minimum compensation were deducted, the breakpoint for percentage compensation would be $348,125, and no percentage compensation would be due).

Smith used yet a third interpretation of Paragraph 3.B, Interpretation Three, to calculate percentage compensation due. Interpretation Three multiplied the percentages stated in the rate schedule times gross sales exceeding $287,500, and then subtracted minimum compensation—if the number arrived at was zero or less, then only minimum compensation was due. For example, Smith computed percentage compensation for the Lake Forest Oasis in 1985 (gross sales of $388,445) as follows:

PC = 16%($388,445 − $287,500) − $55,700
PC = 16%($100,945) − $55,700
PC = $16,151 − $55,700
PC = −$39,549, but if PC < 0 then PC = 0
Therefore PC = 0

Following the above formula, Smith paid Wendy's no percentage compensation in 1985 for the Lake Forest Oasis, whereas under Interpretation One Smith would have had to pay $6,451, and under Interpretation Two Smith would have had to pay $16,151. If Smith had consistently used Interpretation Three, Smith would have paid Wendy's as follows:

### Hinsdale Oasis

| Year | Gross Sales | Percentage Compensation |
|---|---|---|
| 1985 | $250,149 | $ 0 |
| 1986 | $347,090 | $ 0 |
| 1987 | $365,558 | $ 0 |
| 1988 | $440,125 | $ 0 |
| 1989 | $375,288 | $ 0 |
| 1990 | $341,912 | $ 0 |
| 1991 | $328,852 | $ 0 |

### Lake Forest Oasis

| Year | Gross Sales | Percentage Compensation |
|---|---|---|
| 1985 | $388,445 | $ 0 |
| 1986 | $505,419 | $ 0 |
| 1987 | $505,057 | $ 0 |
| 1988 | $609,111 | $ 0 |
| 1989 | $568,523 | $ 0 |
| 1990 | $529,343 | $ 0 |
| 1991 | $503,832 | $ 0 |

Interpretation Three is the correct interpretation only if the rate schedule is interpreted in one of two possible ways. The relevant provision of the rate schedule is "16% of all sales over $287,500 up to $400,000 . . . ." If "all sales over $287,500" means that dollar $287,501 effectively is $1 (i.e. start counting gross sales earned over $287,500 only), then Interpretation Three represents a fair reading of Paragraph 3.B. If, however, "all sales over $287,500" means that no percentage compensation is awarded up to $287,500, but if the $287,501 point is reached then percentage compensation is 16% of $287,501 less minimum compensation, then Interpretation One is the best reading of Paragraph 3.B.

The difficulty with Interpretation Three is that the rate schedule is misleading. Because counting does not begin until reaching $287,501 in gross sales, the clearest rate schedule would total the following percentages:

16% of (($635,625 up to $748,125) − $287,500)
17% of (($748,126 up to $948,125) − $748,125)
18% of (($948,126 up to $1,148,126) − $948,125)
19% of ((Sales in excess of $1,148,126) − $1,148,125).

If Smith had earned $900,000, for example, the calculation would be:

PC = 16%($748,125 − $287,500) + 17%($900,000 − $748,125)
PC = 16%($560,625) + 17%($151,875)
PC = $89,700 + $25,819
PC = $115,519

Smith claims that its original understanding of Paragraph 3.B was Interpretation

Three, which the above charts show it did in fact rely upon in 1985.[6] In 1986, the charts demonstrate that Smith began using Interpretation One instead of Interpretation Three to compute percentage compensation.[7] In 1987, the charts demonstrate that Smith began using Interpretation Two for both oases. In early 1990, Smith discovered that it erroneously had switched to Interpretation Two, and notified Wendy's of its error.

In response, Wendy's informed Smith that it was entitled to percentage compensation based on Interpretation Two. Under protest, Smith continued paying Wendy's percentage compensation based on Interpretation Two. On August 27, 1992, Smith filed a one count complaint based on diversity of citizenship seeking damages in the amount of the excess percentage compensation paid to Wendy's and a declaration of the proper interpretation of Paragraph 3.B.

During the pre-trial phase of the litigation, the district court determined that Paragraph 3.B was ambiguous. Both parties moved for summary judgment, and after the district court denied both motions, the parties conducted a trial in January of 1993. On March 1, 1993, the district court agreed with Smith's interpretation of Paragraph 3.B, and awarded Smith $306,687 plus costs [8] (adopting, without explicitly so stating, Interpretation Three).

In holding in favor of Smith, the district court found that Wendy's modeled Paragraph 3.B after the Wendy's–Authority Agreement—astutely noting that the $287,500 cut-off in the Wendy's–Smith Agreement

came from adding the $200,000 gift shop figure and the $87,500 floral boutique figure from the Wendy's–Authority Agreement. The district court also found, however, that Wendy's accidentally used the draft of the Wendy's–Authority Agreement, not the final product. The Wendy's–Smith Agreement deducts minimum compensation from percentage compensation just as the draft Wendy's–Authority Agreement did, but the final Wendy's Authority Agreement did not deduct minimum compensation—leaving Wendy's in a position in which it could owe the Authority more than it collects from Smith. The district court found that Wendy's drafted Paragraph 3.B in that manner because of "a monumental drafting blunder of its own making." Wendy's filed a motion for reconsideration, which the district court denied on March 16, 1993. Wendy's now appeals from the decision of the district court in favor of Smith.

## II. Analysis

### A. Paragraph 3.B

■ Whether a contract is ambiguous is a question of law that we must review de novo. *A.W. Wendell & Sons v. Qazi*, 254 Ill.App.3d 97, 193 Ill.Dec. 247, 259, 626 N.E.2d 280, 292 (1993); *Goodwine State Bank v. Mullins*, 253 Ill.App.3d 980, 192 Ill.Dec. 901, 625 N.E.2d 1056, 1068 (Ill.App. Ct.1993). Contractual language is ambiguous if it is reasonably susceptible to different constructions. *Stein v. Scott*, 252 Ill.App.3d 611, 192 Ill.Dec. 558, 561, 625 N.E.2d 713, 716 (1993); *Kolmin v. Village of Wilmette,*

---

6. As demonstrated above, Smith clearly relied on Interpretation Three in calculating percentage compensation due for the Lake Forest Oasis. Given the low gross sales at the Hinsdale Oasis in 1985, however, the same percentage compensation due—zero—would be due under all three interpretations of Paragraph 3.B. It therefore is impossible to determine mathematically which formula Smith used for Hinsdale in 1985. Nevertheless, Smith asserts that it used Interpretation Three (without calling it by that name), which Wendy's does not challenge.

7. It is impossible to determine mathematically whether Smith was using Interpretation One or Interpretation Three for the Hinsdale Oasis in 1986, because zero percentage compensation would be due under either formula. We can say

with certainty that Smith was not using Interpretation Two for the Hinsdale Oasis in 1985, given that percentage compensation would have been $9,534 rather than zero, as Smith reported it to Wendy's. Nevertheless, Smith certainly used Interpretation One for the Lake Forest Oasis in 1986.

8. The $306,687 figure is the combined total of all percentage compensation paid by Smith to Wendy's at both the Hinsdale Oasis and the Lake Forest Oasis from 1985 through 1991. The parties obtained an amended corrected judgment order pursuant to Rule 60(a) of the Federal Rules of Civil Procedure on March 22, 1994, and our concerns regarding appellate jurisdiction expressed at oral argument therefore are satisfied.

250 Ill.App.3d 83, 190 Ill.Dec. 195, 197, 621 N.E.2d 64, 66 (1993). The fact that, as discussed at length *supra*, Paragraph 3.B is susceptible to three different constructions (and indeed was construed at various points in all three ways) reveals that the agreement is in fact ambiguous.

Because Paragraph 3.B is ambiguous, Smith is entitled under Illinois law to recover overpayments made under the contract. Had Smith erroneously made payments to Wendy's under a claim of right based on a mistake of law, i.e. a mistake regarding the legal effect of unambiguous language, Smith could not recover those payments. *See Jogger Mfg. Corp. v. Addressograph–Multigraph Corp.*, 346 Ill.App. 1, 104 N.E.2d 655, 658 (1952). That rule, which forbids recovery of payments voluntarily made under a claim of right, has a long-standing exception: Overpayments are recoverable if the payments were made because of a mistake of fact. *Commercial Nat'l Bank v. Bruno*, 75 Ill.2d 343, 27 Ill.Dec. 351, 355, 389 N.E.2d 163, 167 (1979).

Thus, the central question is whether Smith made its payments to Wendy's based on a mistake of fact. Smith paid Wendy's the amount it did because it mistakenly interpreted the contract to require those payments. That conclusion, however, was not a legal one. Just as the construction of an ambiguous contract is a question of fact, *Qazi*, 193 Ill.Dec. at 259, 626 N.E.2d at 292, a mistake made in construing an ambiguous contract is a mistake of fact, *Carollo v. Financial Fed. Sav. & Loan Ass'n*, 182 Ill. App.3d 996, 131 Ill.Dec. 509, 512, 538 N.E.2d 884, 887 (1989). *See also Jogger*, 346 Ill.App. 1, 104 N.E.2d at 658. Because the district court found Paragraph 3.B to be ambiguous and later resolved that ambiguity [9] in favor of Smith, Smith's mistaken interpretation of Paragraph 3.B was a mistake of fact entitling it to reimbursement of overpayments made to Wendy's assuming that the district court was correct in resolving the ambiguity in favor of Smith.

In determining whether the district court erred in resolving the ambiguity in favor of Smith, we examine whether the determination of the district court was clearly erroneous. *See* Fed.R.Civ.P. 52(a); *see also Mucha v. King*, 792 F.2d 602, 604–06 (7th Cir.1986). The clearly erroneous standard of appellate review allows us to reverse the district court's findings only if we have the firm conviction that the district court made a mistake. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948).

We do not have a firm conviction that the district court made a mistake. The district court heard the testimony of Emanuel Halper, an expert in real estate leases familiar with percentage rent provisions. Halper testified that percentage lease provisions operate in the manner explained in Interpretation Three.[10] The district court then examined both the draft and final versions of the Wendy's–Authority Agreement, and concluded that Wendy's accidentally modeled the Wendy's–Smith Agreement after the draft, rather than final, Wendy's–Authority Agreement.

The draft version of the Wendy's–Authority Agreement, on which the district court found Paragraph 3.B was modeled, unambiguously works in the same manner as Interpretation Three. The draft agreement takes the sum of 15% of gift shop gross sales "in excess of" $200,000 and 10% of floral shop sales "in excess of" $87,500, and requires the payment of that sum less minimum compensation of $22,400. The "in excess of" language makes it clear that only sales above $200,000 and $87,500 are multiplied by 15%

---

9. Although the opinion of the district court stated that it found the language of Paragraph 3.B to be unambiguous, in reality it was resolving the ambiguity it previously had held existed in favor of Smith.

10. As explained in the district court's opinion: [Halper] gave an example on how paragraph 3.B should be interpreted assuming $400,000 gross sales. The first step is to calculate gross sales, i.e., the $400,000. The second step is to subtract $287,500 from $400,000, which leaves $112,500. One hundred twelve thousand five hundred dollars times 16 percent equals $18,000. Eighteen thousand dollars less $55,000 equals 0 [given that anything less than zero means no percentage compensation is due], the amount of percentage rent due under the clause at $400,000 gross sales.

and 10% respectively. In terms of an example, if the gift shop had $300,000 in gross sales, only $100,000 would be multiplied by 15% for the purposes of computing whether percentage compensation is due.

The district court examined expert testimony and harmonized all relevant agreements in concluding that Interpretation Three is the correct construction of Paragraph 3.B. That finding is bolstered by the fact that Wendy's drafted Paragraph 3.B, and under settled Illinois law ambiguous contracts usually are construed against their drafters. *See Mitchell v. Jewel Food Stores,* 142 Ill.2d 152, 154 Ill.Dec. 606, 610, 568 N.E.2d 827, 831 (1990). The district court formulated a well-reasoned opinion in this very complex matter, and as such we are not left with a firm conviction that it committed a mistake. *See Anderson v. Bessemer City,* 470 U.S. 564, 576–77, 105 S.Ct. 1504, 1512–13, 84 L.Ed.2d 518 (1985) ("Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.").

### B. Other Alleged Errors

■ Wendy's asserts the existence of two other errors in its brief. First, Wendy's argues that the trial court erred in admitting the testimony of Emanuel Halper, the expert in real estate leases who testified regarding percentage rent provisions. The district court admitted that testimony to assist in resolving the ambiguity in Paragraph 3.B. Wendy's claims that Halper's testimony was not based on custom and usage of the real estate industry, but Wendy's simply is mistaken.

Halper testified at length about the customary and usual meaning given to the first two sentences of Paragraph 3.B.[11] Halper also testified regarding the customary formats for calculating percentage rent in the commercial real estate industry. Evidence of custom and usage is relevant to the interpretation of ambiguous language in a contract. *In re Pearson Bros. Co.,* 787 F.2d

1157, 1161 (7th Cir.1986). The information Halper supplied directly addressed the ambiguity in Paragraph 3.B., and as such the district court properly admitted the testimony. *See* Fed.R.Evid. 402 (except as otherwise provided, all relevant evidence is admissible).

■ Wendy's also claims that the district court improperly awarded Smith the cost of its corporate officers appearing at trial. Smith's bill of costs asks for: (1) $80 each for the witness fees of corporate officers Mark Beidel and Jeffrey Wiggens; (2) $660 each for the travel expenses to appear at trial for Beidel and Wiggens; and (3) $169 for subsistence during trial for Beidel. Wendy's does not challenge the appropriateness of the amounts of these costs under 28 U.S.C. § 1821, but rather challenges the notion that corporate officers can ever be witnesses under Section 1821.

Section 1821 does not define the word "witness." *See* 28 U.S.C. § 1821. In interpreting Section 1821, courts consistently have held that parties are not entitled to witness fees for their own appearances in court. *See, e.g., Green Const. Co. v. Kansas Power & Light Co.,* 153 F.R.D. 670, 678–79 (D.Kan. 1994); *Ingersoll Milling Machine Co. v. Otis Elevator Co.,* 89 F.R.D. 433, 435 (N.D.Ill. 1981). Equally consistently, however, courts have held that costs may be assessed for corporate officers and directors not personally involved in the litigation who testify on behalf of the corporation. *See Green Const. Co.,* 1994 WL 76612 at *6 ("the expenses of a director or officer of a corporate party who is not personally involved in the litigation may be taxable if he is testifying on behalf of the corporation he represents, and that corporation is a party to the lawsuit.") (citations omitted); *Ingersoll,* 89 F.R.D. at 435; *see also* 10 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2678, at 376. Wendy's does not contend that Beidel or Wiggens were personally involved in the litigation, nor does a review of the record reveal that they were personally involved.

---

11. Although Halper testified that no custom or usage existed that would prevent Wendy's and Smith from entering into an agreement different than Interpretation Three, Halper testified at length regarding the customary and usual meaning given to the first two sentences of Paragraph 3.B.

Wendy's challenge to the decision of the district court to award costs goes no further; Wendy's does not challenge the district court's exercise of discretion, but rather only challenges the characterization of corporate officers as witnesses for the purposes of 28 U.S.C. § 1821.[12] The district court properly characterized Beidel and Wiggens as witnesses under Section 1821. The district court therefore committed no error in taxing the expenses of Beidel and Wiggens as costs.

For the foregoing reasons, the opinion of the district court is AFFIRMED.

---

12. Wendy's brief concludes:

    Wendy's objected to [WH] Smith's corporate officers being deemed "witnesses" for purposes of 28 U.S.C. Sec. 1821. In ruling on Wendy's objections, the district court did not exclude these amounts in its order assessing $14,961.57 in costs. The district court erred in failing to exclude these items from the order assessing costs because the costs associated with [WH] Smith's officers attending proceedings in this case are not taxable as costs. (citations to record omitted).