NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with

Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 2, 2013
Decided December 19, 2013

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

No. 13-1846

| | |
|---|---|
| HOMEOWNERS CHOICE, INC.,<br> *Plaintiff-Appellee,*<br><br>  *v.*<br><br>AON BENFIELD, INC.,<br> *Defendant-Appellant.* | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division.<br><br>No. 10 CV 7700<br><br>Harry D. Leinenweber, *Judge.* |

**O R D E R**

Aon Benfield, Inc., is an insurance broker that contracted with Homeowners Choice, Inc., to obtain reinsurance for Homeowners. In this contract, which the parties call a revenue-sharing agreement ("RSA"), Aon agreed to rebate to Homeowners a portion of Aon's commission. After Homeowners decided not to renew the RSA, Aon notified Homeowners that pursuant to the terms of the RSA, it was no longer obligated to pay Homeowners the rebate. Homeowners sued Aon. The district court concluded

that the RSA was ambiguous, and held a bench trial during which it heard extrinsic evidence. Following trial, the district court held that under the RSA's terms, Aon was required to pay Homeowners $744,402.06. Aon appeals.

## I. BACKGROUND

Homeowners is a Florida-based insurance company that provides property and casualty insurance to Floridians. Homeowners regularly purchases reinsurance to insure itself from any large judgments it might incur.[1] Aon is an Illinois corporation that serves as a reinsurance intermediary (or broker) and capital advisor to insurance companies and other commercial entities. Aon was responsible for placing and servicing reinsurance policies for the property and casualty insurance policies written by Homeowners. When Aon placed a reinsurance policy, it earned a brokerage commission.

Generally, to place reinsurance for a particular insurance company, a broker must be the "broker of record" for the underlying insurer. Homeowners signed a Broker Authorization Contract (the "Contract") designating Aon as its broker of record beginning July 1, 2007. The Contract provided that Aon's broker of record status would continue until Aon resigned, was terminated, or was replaced by a successor broker of record. It also provided that, even if Homeowners terminated Aon as broker of record, Aon would still continue to service the reinsurance contracts that it had placed (unless Homeowners opted otherwise), and in any event would still receive the brokerage (commission) from those placements. The Contract contained no provision for revenue sharing.

In 2008, Aon and Homeowners began negotiating an RSA under which Aon would share part of its commission from the reinsurer with Homeowners. This exchange was essentially a rebate in the form of an "Annual Fee" to Homeowners in return for giving Aon exclusive status as Homeowners' reinsurance broker.[2] In

---

[1] "In essence, reinsurance is insurance for insurance companies." *Cont'l Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 729 n.1 (7th Cir. 2005) (citation omitted).

[2] In an attempt to secure Homeowners' business for multiple years, Aon proposed a multi-year RSA, which Homeowners rejected twice because Homeowners was not interested in any agreement that bound it for longer than one year. Homeowners' executives first rejected a multi-year agreement at a conference in the fall

February 2009, Homeowners and Aon discussed a proposed RSA for the period from June 1, 2009 through May 31, 2010 ("the 2009 reinsurance placements").  Meanwhile, Homeowners also entertained proposals from other reinsurance brokers. At this time, Aon was aware of the potential competitors and the fact that Homeowners was experiencing significant growth that could generate substantial commissions.

On February 24, 2009, the parties met at the Tampa Airport through their representatives: Frank McCahill, then-CEO of Homeowners, Paresh Patel, then-Chairman of the Board for Homeowners, Jeff Jones, the individual broker from Aon assigned to the Homeowners account, and Rob Brendahl, a senior Aon executive. The meeting convened to discuss a brokerage arrangement for the 2009 reinsurance placements. The parties reached an oral agreement at this meeting.

The day after the meeting, McCahill and Jones exchanged emails to confirm the terms of the oral agreement the parties reached in Tampa. Both emails stated that the parties had reached a one-year arrangement and confirmed that the agreement included a one-year RSA. Jones informed McCahill that Aon would formalize this agreement in writing because its staff were experts in drafting RSAs.

It is undisputed that Aon's counsel drafted the RSA and that McCahill signed and returned the RSA without alteration on April 29, 2009. The provisions of the RSA material to this case are:

> 1.      In consideration for Client appointing Aon as reinsurance intermediary-broker for the placement and servicing of all reinsurance purchased by the Client (the "Subject Business") for the annual period beginning on June 1, 2009 and ending on May 31, 2010 (an "Agreement Year"), Aon Benfield agrees to share with Client Aon Benfield's received and earned brokerage revenue derived from the Subject Business, excluding any brokerage paid to corresponding brokers including those affiliated with Aon Benfield or sub-brokers ("Net Brokerage Revenue") by paying Client an annual fee ("Annual Fee") for the Agreement Year to be calculated as set out in Schedule A.

---

of 2008 and again after Aon submitted a proposed multi-year agreement to Homeowners' executives on November 8, 2008.

2.      No Annual Fee shall be due for any Net Brokerage Revenue derived from the Subject Business that is less than $1,000,000; <u>nor shall an Annual Fee be payable subsequent to any decision by Client to terminate or replace Aon Benfield as its reinsurance intermediary-broker for any portion of the Subject Business</u>. In addition, in the event Aon Benfield is terminated as Client's reinsurance intermediary-broker for any Subject Business prior to the end of the Agreement Year, Client shall promptly reimburse Aon Benfield for all Annual Fees previously paid by Aon Benfield under this Agreement.  Client agrees to reimburse Aon Benfield for any and all costs and expenses associated with collecting any reimbursement.

*See* App. A (underline added).

Aon remained the reinsurance broker of record for Homeowners for the entire period of the 2009 reinsurance placements (June 1, 2009 through May 31, 2010).  On March 10, 2010, McCahill sent Jones an e-mail stating that Homeowners had chosen another reinsurance broker for the post-May 31, 2010 reinsurance placements and that Homeowners would then be using the new broker. On March 11, 2010, McCahill issued a Broker of Record letter, informing the insurance community that Homeowners had selected TigerRisk Partners as its broker of record for the term of June 1, 2010 through May 31, 2011. On March 14, 2010, Jones responded to this email to express Aon's regrets at Homeowners' decision, but did not say that Homeowners had forfeited the rebate earned under the RSA. On May 14, 2010, Homeowners notified Aon that it was owed $659,943.00 under the RSA. By letter dated July 23, 2010, Aon responded that under Paragraph 2 of the RSA it owed Homeowners nothing because Homeowners replaced Aon Benfield as broker prior to the expiration of the RSA.

Homeowners subsequently brought this action in the district court.  The parties filed cross-motions for summary judgment. The district court determined that Paragraph 2 of the RSA was ambiguous and denied the motions for summary judgment. In March 2012, the district court held a two-day bench trial. Following the trial, the district court ordered post-trial briefing. The district judge concluded that Homeowners and Aon had entered into a one-year RSA. Pursuant to that RSA, Homeowners was entitled to a rebate from the reinsurance policies placed and serviced by Aon on Homeowners' behalf from June 1, 2009 through May 31, 2010. The district court entered judgment for Homeowners in the amount of $744,402.06. *Homeowners Choice, Inc. v. Aon Benfield, Inc.*, 1:10-cv-07700, 2013 U.S. Dist. LEXIS 45938, at *26 (N.D. Ill. Mar. 29, 2013). Aon appeals.

## II. ANALYSIS

On appeal, Aon argues that the RSA is unambiguous and that under the unambiguous language of the RSA, Homeowners forfeited its right to receive a rebate. Relatedly, Aon argues that the district court erred at trial in applying the doctrine of *contra proferentem,* "the rule that if language supplied by one party is reasonably susceptible to two interpretations … the one that is less favorable to the party that supplied the language is preferred."[3] Aon argues that the application of *contra proferentem* here was error because that doctrine only applies to ambiguous contracts and Aon's position is that the RSA was unambiguous.

"Whether a contract is ambiguous is a question of law that we must review *de novo.*" *WH Smith Hotel Servs., Inc., v. Wendy's Int'l, Inc.,* 25 F.3d 422, 427 (7th Cir. 1994) (citing *A. W. Wendell & Sons v. Qazi,* 626 N.E.2d 280, 292 (Ill. App. Ct. 1993)). "In Illinois, '[a]n instrument is ambiguous only if the language used is reasonably or fairly susceptible to having more than one meaning, but it is not ambiguous if a court can discover its meaning simply through knowledge of those facts which give it meaning as gleaned from the general language of the contract.'" *Bourke v. Dun & Bradstreet Corp.,* 159 F.3d 1032, 1036 (7th Cir. 1998). "Ambiguous contractual language is generally construed against the drafter of the language … ." *Duldulao v. St. Mary of Nazareth Hospital Center,* 505 N.E.2d 314, 319 (Ill. 1987) (citations omitted).

### A. The RSA was ambiguous.

The parties' positions on whether the RSA is ambiguous rest on a single dispute: Aon argues that "Subject Business" refers to all of Homeowners' reinsurance contracts, including those formed after the Agreement Year. If we accept Aon's interpretation of "Subject Business," then Homeowners forfeited the rebate because the first sentence of Paragraph 2 of the RSA provides that no fee would be payable to Homeowners after it made "any decision" to "terminate or replace" Aon as its broker of record. On the other hand, Homeowners argues that "Subject Business" is limited to the defined "Agreement Year." If we accept Homeowners' interpretation of "Subject Business," then Homeowners is entitled to the rebate under the RSA because Homeowners did not terminate or replace Aon as its broker of record for the Agreement Year, but rather for the following year.

---

[3] E. Allan Farnsworth, *Farnsworth on Contracts* § 7.11 (3d. ed. 2004).

In this case, we agree with the district court that the first sentence of Paragraph 2 of the RSA is ambiguous. The phrase "Subject Business" could reasonably be read to mean: (1) only reinsurance agreements placed during the Agreement Year; or (2) all reinsurance agreements, including future reinsurance agreements; or (3) all reinsurance placed and serviced by Aon.  If we were to read the language as Aon suggests, Homeowners would not be entitled to a rebate without renewing the RSA for an additional year.  But the RSA clearly states that it was a one-year agreement. This conflict further demonstrates that the language is ambiguous. Aon's interpretation of the RSA is also problematic because it creates an impossibility. The arrangement of text in the RSA here leaves one wondering what consideration Homeowners would have received for executing the RSA if it was forfeited upon completion of a one-year engagement. Under Aon's interpretation, there would have been none; Homeowners would not be entitled to a rebate in consideration of the current one-year contract without renewing the RSA for an additional year beyond the one-year term. But that interpretation of the RSA is not reasonable, so extrinsic evidence is required to shed light on the parties' intent.

Aon nonetheless argues that the RSA is unambiguous, relying on the Eighth Circuit's decision in *Olympus Ins. Co. v. Aon Benfield, Inc.*, 711 F.3d 894 (8th Cir. 2013). In *Olympus,* an insurance company sued Aon after it refused to pay a rebate purportedly due under a multi-year RSA. Like the RSA in this case, the multi-year RSA in *Olympus* stated that an "Annual Fee" or rebate was not "payable" once Homeowners made a decision to "terminate or replace Benfield as its reinsurance intermediary-broker for any portion of the Subject Business."  *Id.* at 896. However, the *Olympus* case is distinguishable from this case because the multi-year RSA in *Olympus* and the RSA here are materially different.

In *Olympus,* "the *unambiguous* language of the contract relieved Benfield of any obligation to pay Olympus the Annual Fee …." *Id*. at 897 (emphasis added). The multi-year RSA in *Olympus* was not ambiguous because, unlike here, it defined the terms "Initial Term" and "One-Year Renewal Term," included language referring to "the initial annual period"and "additional subsequent Agreement Years," and included a 30-day window for either party to notify the other if it intends not to renew the agreement. *Id*. at 896.  Consequently, the *Olympus* court's interpretation of "decision" in the context of a "clear and unambiguous" multi-year RSA has no impact on this case because here the RSA is ambiguous. *Id.* at 899.

**B. The district court properly entered judgment for Homeowners.**

In light of our conclusion that the RSA is ambiguous, Aon's second argument necessarily fails. On appeal, Aon does not argue that, if the RSA is ambiguous, the district court committed reversible error in concluding that the extrinsic evidence introduced at trial supports Homeowners' interpretation of the RSA. *See Curia v. Nelson*, 587 F.3d 824, 832 (7th Cir. 2009) ("… ambiguity can only be clarified by reference to extrinsic evidence of the parties' intent."). Rather, Aon argues that the district court erred in applying the doctrine of *contra proferentem*. But Aon's sole basis for challenging the application of *contra proferentem* in this case is its claim that the RSA was unambiguous[4] and Aon concedes that *contra proferentem* applies to ambiguous contracts[5]—it just disagrees that the RSA at issue here is ambiguous. However, we have already concluded that the RSA is ambiguous. Accordingly, the district court did not err in applying *contra proferentem* to construe the RSA against Aon.

### III. CONCLUSION

The RSA is ambiguous and so the district court properly considered extrinsic evidence, including timely e-mails, and denied the parties' cross-motions for summary judgment. The district did not err in applying the doctrine of *contra proferentem* to construe the RSA against Aon. For these reasons, Homeowners was entitled to the rebate it earned during the period of the 2009 reinsurance placements. Consequently, we AFFIRM the judgment of the district court.

---

[4] *See* Farnsworth at § 7.12a ("[C]*ontra proferentem* [is] applicable only if the language is ambiguous.").

[5] *See* Br. at 44 ("The district court's reliance on *contra proferentem* … appl[lies] only to ambiguous contracts.").

<u>APPENDIX "A"</u>

**AGREEMENT**

Based on the desire of the parties to establish a long-term mutually beneficial relationship, this Agreement "(Agreement") is entered into this 31st day of March, 2009, between Aon Benfield, Inc., with offices at 200 East Randolph Street, Chicago, IL 60601 (doing business a "Aon Benfield") and Homeowners Choice, Inc., including its affiliates, with offices at 2340 Drew Street, Suite 200, Clearwater, FL 33765 ("Client"), under the following terms and conditions:

1.  In consideration for Client appointing Aon as reinsurance intermediary-broker for the placement and servicing of all reinsurance purchased by the Client (the "Subject Business") for the annual period beginning on June 1, 2009 and ending on May 31, 2010 (an "Agreement Year"), Aon Benfield agrees to share with Client Aon Benfield's received and earned brokerage revenue derived from the Subject Business, excluding any brokerage paid to corresponding brokers including those affiliated with Aon Benfield or sub-brokers ("Net Brokerage Revenue") by paying Client an annual fee ("Annual Fee") for the Agreement Year to be calculated as set out in Schedule A.

2.  No Annual Fee shall be due for any Net Brokerage Revenue derived from the Subject Business that is less than $1,000,000; nor shall an Annual Fee be payable subsequent to any decision by Client to terminate or replace Aon Benfield as its reinsurance intermediary-broker for any portion of the Subject Business. In addition, in the event Aon Benfield is terminated as Client's reinsurance intermediary-broker for any Subject Business prior to the end of the Agreement Year, Client shall promptly reimburse Aon Benfield for all Annual Fees previously paid by Aon Benfield under this Agreement. Client agrees to reimburse Aon Benfield for any and all costs and expenses associated with collecting any reimbursement.

3.  Unless otherwise specified in Schedule A, within 60 days after receipt by Aon Benfield of the last premium payment for the Subject Business for the Agreement Year or within 90 days after the expiration of the reinsurance contract(s) that constitute the Subject Business, whichever is earlier, Aon Benfield shall provide Client with a report detailing the Net Brokerage

Revenue for the Agreement Year and including payment of the Annual Fee. In the event that Aon Benfield must pay return brokerage to Client's reinsurers, Net Brokerage Revenue will be recalculated and Client will return to Aon Benfield as soon as reasonably possible any amount due as a result of the recalculation.

4.     This Agreement shall be governed by the laws of Illinois without regard to principles of conflicts of laws, and the parties agree that any disputes arising from this Agreement shall be resolved in the Illinois courts.