2021 IL App (1st) 191637-U

FOURTH DIVISION
March 25, 2021

No. 1-19-1637

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| LEYDIG, VOIT & MAYER, LTD., an Illinois corporation, | ) | Appeal from the |
| | ) | Circuit Court of |
|     Plaintiff and Counterdefendant - | ) | Cook County |
|     Appellee and Cross-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SL PRU, LLC, a Delaware limited liability company, | ) | No. 16 CH 02697 |
| successor-in-interest to BF PRU I, LLC, a Delaware | ) | |
| limited liability company, successor-in-interest to | ) | |
| THE PRUDENTIAL INSURANCE COMPANY OF | ) | |
| AMERICA, a New Jersey corporation, | ) | Honorable |
| | ) | Sophia Hall, |
|     Defendant and Counterplaintiff - | ) | Judge Presiding. |
|     Appellant and Cross-Appellee. | ) | |

_____

    JUSTICE REYES delivered the judgment of the court.
    Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Affirming the judgment of the circuit court of Cook County in favor of a tenant on both its declaratory judgment complaint and the landlord's counterclaim for reformation of the parties' lease and ordering the release of escrowed funds upon issuance of the mandate.

¶ 2    Leydig, Voit & Mayer, Ltd. (Leydig), a law firm specializing in intellectual property law,

leased office space in a Chicago building from successor landlord SL PRU LLC (SL PRU).  The

seventh amendment to the parties' lease, executed in 2007, included a contraction option provision, under which Leydig could discontinue its use of a portion of its leased space if certain conditions were satisfied. The conditions included payment of a contraction fee, comprised of (a) five months' gross rent plus (b) an "unamortized amount, as of May 31, 2017[.]" By the time Leydig exercised the contraction option in 2016, a dispute had emerged between the parties regarding the proper calculation of the unamortized amount. SL PRU contends that the inclusion of the May 31, 2017 date in the contraction option provision was a mistake, as it would always result in an unamortized amount of $0. According to SL PRU, the end date of the amortization period should be the expiration date of the lease – September 30, 2025. Leydig filed a complaint in the circuit court of Cook County seeking a judgment declaring that the contraction option provision should be interpreted as written, *i.e.*, Leydig would owe nothing on account of the unamortized-expense portion of the contraction fee. SL PRU filed a counterclaim against Leydig, seeking reformation of the seventh amendment, *i.e.*, substituting September 30, 2025 in place of May 31, 2017 as the end date of the amortization period. Following a bench trial, the circuit court ruled for Leydig on both its complaint for declaratory judgment and SL PRU's counterclaim for reformation. SL PRU appeals from this ruling, and Leydig cross-appeals from a circuit court order denying its motion for release of escrowed funds. As discussed below, we affirm the judgment except as otherwise provided herein.

¶ 3                                    BACKGROUND

¶ 4                        The Lease and the Seventh Amendment

¶ 5     Pursuant to a lease initially executed with The Prudential Insurance Company of America (Prudential) in 1986, Leydig leased office space at 180 North Stetson Avenue, known as Two Prudential Plaza. The lease provides, in part, that in the event of litigation between the parties,

the prevailing party will recover its litigation costs, including attorney fees, from the other party.

¶ 6     In 2007, Leydig and BF PRU I, LLC (BF PRU) – as successor to Prudential – executed a seventh amendment to the lease, which provided for an expansion of the leased premises; BF PRU incurred various expenses in connection with the expansion.  The seventh amendment also included an option for Leydig to return a significant portion of the expansion space after 10 years (in 2017), approximately 8 years before the end of the lease in 2025.  To exercise the contraction option, Leydig would be required to pay five months' rent plus "the unamortized amount, as of May 31, 2017 ***."[1]

¶ 7                         Leydig's Complaint and SL PRU's Counterclaim

¶ 8     On February 25, 2016, Leydig filed a complaint for declaratory judgment against BF PRU's successor, SL PRU.  The complaint alleged that Leydig had timely exercised the contraction option under the seventh amendment by (a) providing written notice to SL PRU that it intended to discontinue its use of a portion of the building and (b) tendering to SL PRU the amount of $306,310.24, which is equal to five months of gross rent due for such space.  The complaint further alleged that since the "unamortized amount, as of May 31, 2017" was $0, Leydig had satisfied the express terms of the contraction option provision.

¶ 9     The complaint described communications in late 2015 and early 2016 regarding the

---

[1] Section 15(b) of the seventh amendment provides, in part, that the contraction fee would be comprised of "(i) five months' Base Rent and Additional Rent at the rates that would otherwise be payable under the Lease but for the Tenant's exercise of the Contraction Option for the five months immediately following the Contraction Date plus (ii) the unamortized amount, as of May 31, 2017, of the total of (A) the disbursed Initial Alterations Allowance, plus any other allowances disbursed by Landlord in connection with Tenant's lease of any Expansion Space pursuant to Paragraph 11 of this Amendment and/or any First Offer Space (if applicable) or other space added to the Lease after the date of this Amendment plus (B) any leasing commissions, plus (C) any free rent provided to Tenant pursuant to or after the date of this Amendment.  The total of the amounts to be amortized under clauses (A), (B) and (C) of this paragraph is referred to hereinafter as the "**Amortization Amount**."  For purposes of calculating the unamortized portion of the Amortization Amount, the amortization period shall be the period commencing on June 1, 2007, and ending on May 31, 2017, and the amortization shall be on a straight line basis at an annual interest rate of ten percent (10%)."  (Emphases in original.)

parties' respective positions concerning the contraction option calculation. SL PRU's agent asserted that the "relevant amortization period would run from May 31, 2017 to September 30, 2025," *i.e.*, the end date of the lease. SL PRU thus claimed an additional $1,160,607.21 was due from Leydig, resulting in a total fee of $1,466,917.45. Leydig disputed these contentions, noting that the contraction option provision stated in three places that the amortization period ends on May 31, 2017. In its complaint, Leydig sought a declaratory judgment declaring that the provision should be interpreted according to its "clear and unambiguous terms."

¶ 10    To preserve its rights under the contraction option, Leydig filed an emergency motion to deposit the disputed funds with the clerk of the circuit court of Cook County. The circuit court entered an agreed order on February 26, 2016, directing the clerk to accept Leydig's tender of $1,160,607.21 and to deposit the funds into escrow "pending the disposition of this case."

¶ 11    In its answer, SL PRU admitted that it was seeking an additional $1,160,607.21 from Leydig and stated that the contraction option "contains a scrivener's error and mutual mistake." SL PRU filed a counterclaim seeking reformation, alleging that prior to drafting and executing the seventh amendment, the parties had executed a letter of intent (LOI) which outlined the terms of the lease and described the fee to be paid by Leydig if it were to elect to reduce the size of its leased space. The LOI provided that the contraction fee would consist of two components: (a) five months of gross rent plus (b) "the value of unamortized costs amortized at 10%, including leasing commissions, tenant improvements, free rent and any other concessions or allowances." According to SL PRU, if Leydig did not elect to contract (or reduce) the size of its leased premises, then all such costs would be fully amortized and recovered by SL PRU through Leydig's full payment of the rent for the expanded leased premises. If Leydig chose to reduce the size of the leased premises, however, the fee would include those costs which had not yet

been amortized since SL PRU would be paid less rent after the reduction.

¶ 12    SL PRU alleged that the seventh amendment misstated the period of unamortized costs, *i.e.*, it used the "start" date as the "end" date for the amortization period.  Since the same date was used for the start date and end date of the amortization period, the "unamortized" amount – by definition – had to be zero.  SL PRU alleged such a result was contrary to the parties' intent as expressed in the LOI.  Accordingly, SL PRU sought reformation of the seventh amendment, *i.e.*, substituting September 30, 2025 in place of May 31, 2017, as the end date of the amortization period.

¶ 13     Leydig's Motion to Dismiss Counterclaim and For Judgment on the Pleadings

¶ 14    Leydig filed a motion to dismiss the counterclaim and for judgment on the pleadings under sections 615(a) and 615(e) of the Code of Civil Procedure (735 ILCS 5/2-615(a), (e) (West 2016)).  Leydig argued, in part, that SL PRU asserted mutual mistake based on the LOI, but the LOI did not include an end date for the amortization period and expressly stated that it was not binding on the parties.  Leydig further observed that BF PRU had circulated an initial draft of the seventh amendment with an amortization period end date of March 31, 2017, and subsequently revised the proposed end date to February 28, 2017, and then April 20, 2017, before settling on May 31, 2017.  According to Leydig, SL PRU is not entitled to reformation for the unilateral mistake of its predecessor, which was a sophisticated commercial party represented by counsel.

¶ 15    SL PRU responded, in part, that if the parties intended for the unamortized-expense amount to be $0, then there was no need for the seventh amendment to devote so many words to explaining its calculation.  SL PRU asserted that the seventh amendment should be reformed to reflect the parties' "obvious intent" that some amount was to be paid on account of unamortized expenses.  In its reply, Leydig argued that SL PRU had not pled any mistake by Leydig or that

any meeting of the minds occurred regarding a different amortization period end date. Leydig acknowledged that the contraction provision did "perhaps include[] more verbiage than necessary," but asserted that this does not mean that the language lacked meaning or that Leydig was mistaken regarding its effect. The circuit court denied the section 2-615 motion.

¶ 16                           SL PRU's Amended Counterclaim

¶ 17    After certain discovery was completed, SL PRU filed a motion for leave to supplement or amend its counterclaim. SL PRU asserted that newly discovered evidence indicated that Leydig knowingly concealed the presence of the mistaken date in the drafts of the seventh amendment from BF PRU since it would be favorable to Leydig, even though Leydig knew that the mistaken date did not reflect the parties' true agreement. Leydig responded that SL PRU had not alleged that Leydig was under any duty to disclose and had failed to plead that BF PRU could not have discovered the "mistake" through reasonable inquiry or inspection. Leydig further argued that: (a) there was no agreement regarding the specific dates of the amortization period prior to the execution of the seventh amendment; (b) Leydig did not "know" that BF PRU's counsel made a mistake; and (c) Leydig did not conceal BF PRU's purported mistake.

¶ 18    The circuit court granted the motion, and SL PRU filed an amended two-count counterclaim seeking reformation of the seventh amendment. Count I was based on mutual mistake; count II was based on unilateral mistake and fraud.

¶ 19                           Cross-Motions for Summary Judgment

¶ 20    SL PRU filed a motion for partial summary judgment as to Leydig's complaint and on count II of its counterclaim. Among other things, SL PRU argued that, prior to its execution, when the seventh amendment was being drafted, Leydig's real estate attorney John Stephens (Stephens) was aware of the consequence of using the contraction date for the end date of the

amortization period which would result in the unamortized-cost component becoming zero. When asked during his deposition if there was any reason, he had not suggested striking out the terms for how to calculate the unamortized amount, he responded, "I just didn't see the need to do that [since] [t]he way it was calculated was favorable to my client. And so, we chose not to comment on it." According to SL PRU, Stephens admitted that during the negotiations of the seventh amendment he never notified anyone associated with the landlord that the consequence of the unamortized costs would be zero. SL PRU also asserted that Steven Petersen (Petersen), an attorney at Leydig – who was also involved in the negotiations of the seventh amendment – admitted he knew that the contraction option provision meant the unamortized costs would be zero. He also did not recall anyone on Leydig's side informing anyone on the landlord's side of this outcome.

¶ 21    SL PRU further noted that in 2015 – prior to Leydig's request to exercise the contraction option in the seventh amendment – Leydig's real estate broker Beth McGee Grogan (Grogan) prepared materials which contained an analysis of the contraction fee for Leydig's use in considering its subleasing options. In calculating the unamortized-costs component of the contraction option, she used the end of the lease date as the amortization date which resulted in a fee of approximately $1.2 million. During her deposition, Grogan testified that the reason to use unamortized costs in this context is to pay back the landlord if the tenant does not complete its lease, *i.e.*, to repay the funds the landlord put into the deal, such as the tenant improvement allowance, commissions, and rent abatement. According to SL PRU, Grogan's use of the end date of the lease for the end date of her amortization table confirmed that the seventh amendment contained a scrivener's error, as her amortization table matched the parties' true agreement.

¶ 22    In a cross-motion for summary judgment, Leydig argued that there was no meeting of the

minds between the parties that the end date of the amortization period would be September 30, 2025. Leydig further contends that there was no evidence of any (a) mistake on the part of the parties in agreeing to May 31, 2017 as the end date of the contraction option in the seventh amendment or (b) fraud on Leydig's part when it was the landlord's counsel that proposed – and repeatedly changed – the end date for the amortization period. According to Leydig, the conduct of the landlord's representatives gave Leydig and its representatives the impression that the end date they proposed in writing was the end date they intended.

¶ 23    The circuit court denied the parties' cross-motions for summary judgment, and the case proceeded to trial.

¶ 24                                    Pretrial Motions

¶ 25    The parties filed various motions *in limine*, including Leydig's motion to exclude SL PRU's experts seeking to testify regarding the real estate industry's custom and practice. SL PRU had disclosed several fact witnesses as "independent expert witnesses" to testify as to industry custom and practice, including Andrea Saewitz (Saewitz), a real estate broker for BF PRU, and Bryan Oyster (Oyster), the general manager at the property in question. SL PRU had also disclosed a "controlled expert witness," Patrick J. Caruso (Caruso). Caruso had opined in a two-page letter that in his decades of representing landlords and tenants in lease negotiations, he never discussed a lease provision wherein the unamortized costs are zero when an option is exercised before the end of the lease term. Caruso further opined that it is understood "in every case and by all parties" that the intent is for the landlord's costs to be amortized over the entire lease term. Leydig argued that testimony on industry custom and practice was not admissible since it was not relevant to the reformation analysis, *i.e.*, "[e]vidence of custom and practice in an industry is distinct from what any given ***party's*** intention and understanding may be."

(Emphasis in original.)

¶ 26    The circuit court granted Leydig's motion. While Saewitz and Oyster were permitted to testify at trial, they were not allowed to testify regarding the real estate industry's custom and practice. Prior to the commencement of the trial, SL PRU submitted offers of proof regarding the opinion testimony of Caruso, as well as Saewitz and Oyster.

¶ 27                              Trial Testimony

¶ 28    The trial testimony included the following. John Kilyk, Jr. (Kilyk), a Leydig attorney, testified he was part of a three-member *ad hoc* committee established in 2006 to "work on the lease extension." The other members of the committee were Petersen and Leydig's president John Kozak (Kozak). According to Kilyk, the firm was considering either extending the lease or moving to a new location; the committee was charged with exploring options and reporting back to the firm's board. The committee hired William A. Rogers, Jr. (Rogers) as their real estate broker.

¶ 29    Kilyk testified that the committee's overriding concern during this entire process was to obtain the lowest cost to the firm. The committee also sought flexibility to expand or reduce the amount of leased space to respond to the firm's future needs. The decision eventually was made to extend the firm's existing lease. Kilyk signed the LOI, which the committee viewed as an "agenda" and a "place to start negotiations." He also testified that he did not recall having any understanding of a proposed amortization period for the contraction option in the LOI. As to the seventh amendment, Kilyk recalled that multiple drafts were circulated between the parties. He further testified that it was his understanding that Leydig was not making any kind of mistake by entering into the seventh amendment. Kilyk was also "not aware of anything that we withheld at all, material or immaterial, during the entire lease negotiation process."

¶ 30    During cross-examination, Kilyk could not recall various changes to and communications regarding the LOI, *e.g.*, a change in the initial draft of the LOI which increased the interest rate for the amortization calculation from 8% to 10%. As of the time of his trial testimony, Kilyk did not understand what "unamortized costs" meant in the context of the LOI. Kilyk's impression was that the cost of the contraction option in the seventh amendment would be low, based in part on the statements of BF PRU's manager, C. Frederick Webha II (Webha), that "he'd make it worth our while to stay there." Kilyk also testified that he was not familiar with the custom and practice in the real estate industry.

¶ 31    Kozak, one of the other committee members, testified that he wanted consistency in the firm's real estate costs, *i.e.*, no "peaks or valleys." Although he executed the seventh amendment, he did not recall being involved in its negotiation or specifically reviewing any draft thereof. Kozak testified he was "extremely surprised" when he later learned that SL PRU was demanding a $1.4 million contraction fee. When questioned during cross-examination regarding the use of the May 31, 2017 date in the seventh amendment, he testified that he had no recollection of studying the seventh amendment to the point of recognizing what part the dates would have on the calculation.

¶ 32    Petersen, another member of the Leydig committee, testified that when he was presented with a draft of the seventh amendment during the negotiation process, he attempted to calculate the approximate amount of the contraction fee. He concluded "it would be in the range of a few hundred thousand dollars." He determined that the second component of the calculation – relating to the unamortized costs – would be zero "[b]ecause the end date of the amortization period was the same as the contraction date." Although he testified that the "language has a purpose," he acknowledged that it was "hard" for him to assess the purpose.

¶ 33    Petersen further testified that in 2015, the firm engaged its real estate broker to present cost estimates of the firm's different options with respect to the lease.  When Petersen received an analysis that included a $1.5 million contraction fee, he was "shocked" by the calculation.  He subsequently learned that the broker made a mistake in the contraction fee calculation.

¶ 34    Petersen testified that the LOI did not change his understanding of the contraction fee since the seventh amendment included a definition of the amortization period and the LOI did not.  He did not believe that Leydig made a mistake in agreeing to the contraction option provision.  Petersen also testified that he was not aware of any material facts related to the seventh amendment that Leydig attempted to keep from the landlord during their negotiations.  On cross-examination, Petersen testified that he was not aware that anyone on the landlord's side of the transaction was aware that the unamortized portion of the contraction fee would be zero.

¶ 35    Rogers, Leydig's real estate broker, testified that during the negotiations of the seventh amendment he did not recall noticing that the end date for the amortization period was the same as the contraction date.  When Rogers later provided real estate services to Leydig in 2015, he asked his colleague Grogan to prepare a calculation of the costs associated with the firm's exercise of the contraction option.  Her calculation was approximately $1.5 million.  Grogan subsequently testified that her calculation of unamortized costs was "mistaken" since she incorrectly used September 30, 2025 as the end date of the amortization period.

¶ 36    Stephens, a real estate attorney who represented Leydig in connection with the seventh amendment, testified that he had noticed during the parties' negotiations that the contraction date had been inserted for the end date of the amortization period.  According to Stephens, "the bottom line is that that component of the formula would result *** in no amount due because the amortization – the amounts at issue, which are these costs, would be fully amortized as of that

date." He did not recall whether he ever considered proposing deleting this component of the contraction fee calculation. He also did not recall notifying anyone on the landlord's side regarding the consequence that the unamortized amount of the contraction fee would always be zero. Stephens assumed that, given that the landlord included such language, "there's a reason that they put that in the document," although Stephens did not know what the reason was for its inclusion.

¶ 37     Bryan Oyster testified that he was the general manager of the property in 2006 and 2007, as well as in 2015 and 2016. After receiving an email request from Petersen in 2015, Oyster and his accountant prepared a calculation of the contraction fee for Leydig, totaling approximately $1.46 million. In preparing the amortization table, they used an end date of September 30, 2025, *i.e.*, the expiration date of the seventh amendment.

¶ 38     Andrea Saewitz testified that she was a real estate broker for BF PRU in connection with the parties' negotiations in 2006 and 2007. She testified that she and Rogers had discussions regarding the contraction option provision in the LOI. Among other things, she and Rogers had "agreed what the unamortized costs were," which were then included in the LOI. On cross-examination, Saewitz testified that she did not have authority to agree to lease terms or to execute lease documents for BF PRU.

¶ 39     Mary Robinson (Robinson), an attorney retained as an expert on legal ethics, testified that she was asked to review certain materials and offer an opinion on whether attorney Stephens complied with his ethical obligations in his representation of Leydig in connection with the seventh amendment. She concluded that he complied with his ethical obligations. According to Robinson, Stephens did not have a duty to make a disclosure regarding the contraction option calculation since he had no knowledge of any fraud by his client. She also testified that there

was no material fact that Stephens knew – and which the landlord's side did not know – which he failed to disclose. Robinson opined that Stephens did not owe a duty to the landlord to make edits to the provision because, among other things, he did not have any reason to believe Leydig had not agreed to the provision as it is drafted.

¶ 40                                Circuit Court Decision

¶ 41     In a decision entered on July 11, 2019, the circuit court (a) found for Leydig on SL PRU's counterclaim for reformation and for Leydig on its complaint for declaratory judgment and (b) declared that Leydig has complied with the contraction option provision. Among other things, the court determined that SL PRU failed to prove that BF PRU and Leydig mutually agreed to an amortization period end date other than the end date expressed in the seventh amendment. The court denied the admission of evidence depositions of Maria King (King) – the real estate attorney who initially drafted the seventh amendment and incorporated the agreed-upon modifications thereof – and Hans Mumper (Mumper) – a manager for Bentley Forbes Midwest Property Management, the managing member of BF PRU – who was involved with Saewitz in the negotiations.

¶ 42     The circuit court further found that there was no proof of a mistake by BF PRU or Leydig, and that Leydig did not commit fraud. Finally, the circuit court rejected SL PRU's arguments that the contraction fee language is ambiguous on its face or that Leydig's interpretation results in certain language being rendered meaningless surplusage. SL PRU filed a notice of appeal on August 9, 2019.

¶ 43     Pursuant to the attorney fee provision in the parties' lease, Leydig filed a fee petition with the circuit court, which remains pending at this time.

¶ 44                              Motion to Release Escrow Funds

¶ 45    On August 6, 2019, Leydig filed a motion for the release of the escrow funds in the amount of $1,160,607.21 deposited with the Clerk of the Circuit Court of Cook County at the commencement of the litigation.  Leydig represented that it had taken out and drawn down a line of credit to place the funds in escrow and was paying "significant amounts" of interest on the line of credit.  Leydig acknowledged that its fee petition was pending but asserted that the merits of the complaint and counterclaim had been addressed and thus the escrowed funds (and any interest thereon) should be immediately released to Leydig or its representative.  SL PRU responded that the motion should be denied since its appeal is a continuation of the case and the fee petition has not been ruled upon.  In an order entered on September 9, 2019, the circuit court denied the motion.

¶ 46    On October 8, 2019, Leydig filed a motion for an express written finding under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), or alternatively, Illinois Supreme Court Rule 308 (eff. Oct. 1, 2019) certification as to the order denying the motion for release of escrow funds.  Over SL PRU's objection, the circuit court entered an order on December 9, 2019 granting the motion and making an express written finding pursuant to Rule 304(a) that there is no just reason for delaying either enforcement or appeal of the court's July 11, 2019 decision or its September 9, 2019 order denying the motion for release of the escrow funds.  Leydig filed a cross-appeal challenging the denial of its motion to release the escrowed funds.

¶ 47                                ANALYSIS

¶ 48    SL PRU advances two primary arguments on appeal.  First, SL PRU contends that it established by clear and convincing evidence that the seventh amendment should be reformed based on mistake.  Second, SL PRU asserts that the circuit court erred in barring Caruso, Oyster and Saewitz from providing expert testimony as to the real estate industry's custom and practice.

In its cross-appeal, Leydig argues that the circuit court erred in denying its motion to release the escrowed funds. We discuss each contention below.

¶ 49    There is a presumption that a written instrument conforms to the intention of the parties. *CitiMortgage, Inc. v. Parille*, 2016 IL App (2d) 150286, ¶ 32; *Wheeler-Dealer, Ltd. v. Christ*, 379 Ill. App. 3d 864, 869 (2008). A court may reform a contract when the written agreement does not reflect the intent of the parties. *Parille*, 2016 IL App (2d) 150286, ¶ 29. Such a claim rests on the theory that the parties reached an agreement but then somehow erred (by mutual mistake of fact, or by mistake on one side and fraud on the other) in reducing that agreement to writing, with the result being that the writing fails to reflect the parties' agreement. *Id.* See also *Magnus v. Lutheran General Health Care System*, 235 Ill. App. 3d 173, 183-84 (1992). Thus, the purpose of a reformation action is to change a written instrument by inserting some omitted provision or deleting some existing provision so that the document conforms to the parties' original agreement. *Wheeler-Dealer*, 379 Ill. App. 3d at 869.

¶ 50    To plead a claim for reformation, a plaintiff must allege: (1) the existence and substance of an agreement between the parties and the identity of the parties to the agreement; (2) that the parties agreed to reduce their agreement to writing; (3) the substance of the written agreement; (4) that a variance exists between the parties' original agreement and the writing; and (5) the basis for reformation (*e.g.*, mutual mistake). *Parille*, 2016 IL App (2d) 150286, ¶ 29; *Schivarelli v. Chicago Transit Authority*, 355 Ill. App. 3d 93, 100 (2005). See also *Goodwine State Bank v. Mullins*, 253 Ill. App. 3d 980, 991 (1993).

¶ 51    To succeed in a reformation action, a party must establish the elements of the claim by strong, clear, and convincing evidence that there has been a meeting of the minds resulting in an actual agreement between the parties but at the time the agreement was reduced to writing and

executed some agreed upon provision was omitted. *Parille*, 2016 IL App (2d) 150286, ¶ 32. Accord *Brady v. Prairie Material Sales, Inc.*, 190 Ill. App. 3d 571, 578 (1989). See also *National Ben Franklin Insurance Co. v. Davidovitch*, 123 Ill. App. 3d 88, 91 (1984) (noting that mutual mistake must be proven clearly and convincingly as "equity cautions *** that reformation if misapplied can lead to more damage than that caused by its denial"). In the instant case, SL PRU has the burden of establishing by clear and convincing evidence that Leydig and BF PRU reached a meeting of the minds which resulted in an actual agreement between them, but that, at the time the agreement was reduced to writing and executed in the seventh amendment, some agreed-upon provision was omitted, or one not agreed upon was inserted through mutual mistake or through mistake by BF PRU and fraud by Leydig. See *Wheeler-Dealer*, 379 Ill. App. 3d at 869.

¶ 52     The question of whether SL PRU has presented sufficient evidence to meet this higher burden of proof (*Goodwine State Bank*, 253 Ill. App. 3d at 996) and overcome the presumption that the seventh amendment as written expresses the parties' true intention is primarily a question of fact, and we will not disturb the circuit court's decision unless it is against the manifest weight of the evidence. *Great America Federal Savings & Loan Ass'n v. Grivas*, 137 Ill. App. 3d 267, 274 (1985). Accord *Wheeler-Dealer*, 379 Ill. App. 3d at 869; *Schivarelli*, 355 Ill. App. 3d at 100. See also *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995) (noting that where testimony is conflicting in a bench trial, the trial court's findings will not be disturbed unless they are against the manifest weight of the evidence). A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be arbitrary, unreasonable, or not based on evidence. *Id.*

¶ 53                                    Mistake

¶ 54     As noted above, a party seeking reformation of a contract must show a mistake by both parties or a mistake by one party which is known and concealed by the other party. *In re Marriage of Johnson*, 237 Ill. App. 3d 381, 394 (1992). SL PRU is seeking reformation of the seventh amendment under either theory.

¶ 55     For purposes of reformation of a written instrument, a mutual mistake exists when the contract has been written in terms which violate the understanding of both parties. *Parille*, 2016 IL App (2d) 150286, ¶ 29; *Biren v. Kluver*, 35 Ill. App. 3d 692, 696 (1976). A mutual mistake is one that is common to the parties such that each labors under the same misconception; the parties actually agree but the written agreement does not express their real intent. *Parille*, 2016 IL App (2d) 150286, ¶ 29. Accord *Wheeler-Dealer*, 379 Ill. App. 3d at 869. When it is alleged a mistake was made parol evidence may be utilized to demonstrate the real agreement between the parties and the purpose of the evidence is to make the contract conform to the parties' original intent. *Danhauer v. Danhauer*, 2013 IL App (1st) 123537, ¶ 29. See also *Parille*, 2016 IL App (2d) 150286, ¶ 30 (noting that because the claim is that the instrument's language does not accurately reflect the intent of the parties, parol evidence may be introduced on the issue of the parties' intent, even when the instrument to be reformed is clear and unambiguous on its face).

¶ 56     An instrument may also be reformed upon proof of mistake by one party to the contract when the other party knows of the mistake and fails to inform the other party or conceals the truth from him. *Biren*, 35 Ill. App. 3d at 696. "In actions for reformation based on the existence of a unilateral mistake coupled with fraud, we have looked to whether the parties have reached a mutual agreement; but the defendant, knowing that the instrument finally prepared does not accurately reflect that agreement, has concealed the defect from plaintiff at the time of

execution." *Sheldon v. Colonial Carbon Co.*, 116 Ill. App. 3d 797, 802 (1983). Accord *Klemp v. Hergott Group, Inc.*, 267 Ill. App. 3d 574, 585 (1994). See also *Magnus*, 235 Ill. App. 3d at 183 (providing that contract reformation is "proper where one party is mistaken about an instrument's terms and where the other party knows of the mistake but fails to inform him or conceals the truth").

¶ 57    In the instant case, SL PRU has failed to satisfy its burden in several key respects. First, SL PRU did not establish that there was an express agreement between Leydig and BF PRU as to the end date of the amortization period which is different from what is stated in the contraction option. Despite SL PRU's contentions to the contrary, there was no clear evidence of a meeting of the minds between the parties as to an amortization period ending on September 30, 2025. The LOI does not include any amortization period, and SL PRU has not demonstrated that BF PRU communicated to Leydig any intention that the amortization period end with the lease term or that Leydig so agreed. *Klemp*, 267 Ill App. 3d at 584 (noting that "[e]quity cannot make a new agreement for the parties under the color of reforming the one made by them, nor can it be used to add a provision to the contract that was never agreed upon").

¶ 58                                  Mutual Mistake

¶ 59    SL PRU also failed to meet its burden of establishing the existence of a mutual mistake by the parties at the time of the seventh amendment. Among other things, no evidence was presented that at the time Webha executed the seventh amendment that BF PRU did not know that the amortization period ended on May 31, 2017. SL PRU argues that the circuit court should have considered the testimony from attorney King, who drafted the document, and Mumper, who was involved in the negotiations. Unlike Webha, there is no indication that King or Mumper had the authority to bind BF PRU. Even assuming *arguendo* that the circuit court

erred in denying the admission of their testimony because they were not the contracting parties, any error was harmless as neither King nor Mumper had any specific recollection relating to the transaction or, specifically, the seventh amendment. See *Inman v. Howe Freightways, Inc.*, 2019 IL App (1st) 172549, ¶ 157 (noting that harmless error occurs when, despite the presence of an error, it appears no harm has been done). While King surmised that she had made an error in the seventh amendment based on her reading of the amendment prior to her deposition, she had no independent recollection of the drafting process which occurred in 2007. Similarly, when Mumper was asked whether he had a "specific recollection" relating to this transaction (the seventh amendment), he responded, "I really don't."

¶ 60    Furthermore, the evidence contradicts SL PRU's contention that Leydig made a mistake. The Leydig representatives testified that they had not agreed to a particular end date for the amortization period prior to the seventh amendment. SL PRU speculates, however, that Leydig must have made a mistake in agreeing to the contraction option in the seventh amendment. Although the inclusion of a calculation which, by definition, equals zero may be curious, the reformation of a document because of mistake will not be granted upon evidence that is loose or equivocal. *Holbrook v. Tomlinson*, 304 Ill. 579, 585 (1922).

¶ 61    We are also unpersuaded by SL PRU's contentions regarding alleged fraud by Stephens or possibly Petersen. The trial court had a superior vantage point, which cannot be reproduced from the cold record, to observe and judge the credibility and demeanor of the witnesses. *Racky v. Belfor USA Group, Inc.*, 2017 IL App (1st) 153446, ¶ 107. In any event, there is no allegation that either attorney misrepresented any facts; fraud would have to be predicated on their nondisclosure. *Wilcox v. Natural Gas Storage Co. v. Illinois*, 24 Ill. 2d 509, 513 (1962). Their testimony did not reveal that their nondisclosure was deliberate or with an intention to deceive,

nor was there any allegation that BF PRU or its counsel inquired as to the purpose or meaning of the challenged portion of the contraction option provision. See *id.*

¶ 62    SL PRU contends that the circuit court erred in barring the expert testimony of controlled witness Caruso and independent expert witnesses Oyster and Saewitz as to the "custom and practice" in the real estate industry of using unamortized costs through the lease term as a pricing mechanism for contraction options. The decision whether to admit expert testimony is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003). As an initial matter, the trial court determined that it did not require the challenged expert testimony to adjudicate the deal reached by BF PRU and Leydig or the intentions of the contracting parties. *Cf. People v. Bennett*, 376 Ill. App. 3d 554, 571 (2007) (noting that expert testimony is proper where such testimony will aid the fact finder in reaching its conclusion). Furthermore, the opinions derived from the witnesses' experiences with other transactions is not relevant in determining the intention of the contracting parties in the specific transaction at issue herein. *Parille*, 2016 IL App (2d) 150286, ¶ 29 (providing that a court may reform a contract when the written agreement does not reflect "the parties' intent"). Based on the foregoing, the trial court did not abuse its discretion in barring the expert testimony.

¶ 63    For the reasons discussed above, we conclude that the trial court's ruling in favor of Leydig on its declaratory judgment complaint and on SL PRU's counterclaim for reformation was not against the manifest weight of the evidence. *Wheeler-Dealer*, 379 Ill. App. 3d at 869. Simply put, SL PRU has not satisfied the exacting standard for contract reformation.

¶ 64    In its cross-appeal, Leydig contends that the trial court erred in denying its motion for release of the escrowed funds in the amount of $1,160,607.21. The parties disagree regarding the meaning of the language in their agreed order regarding the deposit of the funds into escrow

"pending the disposition of this case." Leydig seeks the immediate release of the funds, whereas SL PRU contends that the instant appeal and the pending fee petition are indicative of no current "disposition of this case."

¶ 65    An agreed order adopted by the court is not an adjudication of the parties' rights but, rather, a record of their private contractual agreement and must be construed to give effect to the intent of the parties, which is determined from the language of the order when there is no ambiguity in its terms. *In re Marriage of Watkins*, 2017 IL App (3d) 160645, ¶ 28.  An agreed order is a written agreement between the parties and is to be interpreted as any other contract. *Village of Lakemoor v. First Bank of Oak Park*, 136 Ill. App. 3d 35, 41 (1985).  The construction of a contract presents a question of law; our review is *de novo*.  *Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007).

¶ 66    Unlike an appeal bond (*e.g.*, Ill. S. Ct. R. 305 (eff. July 1, 2017)), the purpose of the escrowing was to preserve Leydig's position with respect to the exercise of the contraction option in the seventh amendment.  Since we are affirming the decision of the circuit court as to the primary underlying dispute, *i.e.*, the reformation claim, we are inclined to order the release of the funds.  While we recognize that a fee petition is pending in the circuit court, the escrowed funds have no direct relation to the attorney fee and related amounts apparently in dispute. Therefore, upon the issuance of the mandate in the instant appeal, the clerk of the circuit court is directed to release the escrowed funds to Leydig.

¶ 67    Finally, we note that Leydig filed a motion for leave to supplement the prayer for relief in its appellate brief to request that this court award Leydig its fees and costs incurred "in responding to this appeal" and remand the case to the trial court for entry of the award of attorney fees and costs.  SL PRU responded that the trial court's Rule 304(a) finding (Ill. S. Ct.

R. 304(a) (eff. Mar. 8, 2016)) "excluded Leydig's fee claim because it remains pending below." On January 21, 2021, we entered an order taking the motion and response with the case. We consider the issue of attorney fees for this appeal to be inseparable from the general determination of attorney fees in this matter. As the issue of attorney fees was previously carved out from this appeal by virtue of the Rule 304(a) finding – which was requested by Leydig – this court lacks jurisdiction as to the overall issue of attorney fees. See *Wofford v. Tracy*, 2015 IL App (2d) 141220, ¶ 23 (noting that the reviewing court lacks jurisdiction over counts to which the trial court did not issue a Rule 304(a) finding). Leydig's motion for leave to supplement the prayer for relief is therefore denied.

¶ 68                                    CONCLUSION

¶ 69     The judgment of the circuit court is affirmed, except as to the release of the escrowed amounts, as provided in this decision.

¶ 70     Affirmed as modified.